Julio **HUERTAS,** Carmen Melendez, Francisco Garcia, Rosaria Esperon, Raphael Negron, Angelo Vasquez, Maria Sanchez, Joyce Johnson, and Betty Johnson, individually and on behalf of all other persons similarly situated, and the Lower East Side Joint Planning Council On Housing and It's Time, Inc., Plaintiffs,

v.

**EAST RIVER HOUSING CORP.,** Seward Park Housing Corp., Hillman Housing Corp., Amalgamated Dwellings, Inc., Ralph Lippman, as President and a member of the board of directors of East River Housing Corp., President of Hillman Housing Corp., and President of Amalgamated Dwellings, Inc., and Harold Ostroff, as President and a member of the board of directors of Seward Park Housing Corp., Inc., Defendants.

No. 77 Civ. 4494 (RLC).

United States District Court, S.D. New York.

July 2, 1987.

Kenneth Kimerling, Puerto Rican Legal Defense and Educ. Fund, Inc., New York City, for plaintiffs.

Szold & Brandwen, P.C., New York City, for defendants; Alan G. Blumberg, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

This ten-year-old case must be decided, an eventuality I had hoped and sought to avoid. My studied effort to forestall a court-mandated resolution of this controversy did not result from any anticipated difficulties in reaching a proper and just determination. The case, tried to the court February 9–19, 1981, conclusively established a pattern and practice of intentional racial discrimination by defendants in allocating apartments in buildings under their control. However, I sought to avoid the community tension that might result from a court-ordered solution. My conviction is that community tension caused by racial controversies is more easily alleviated if the disputing parties can be persuaded to agree among themselves on a solution.

In this case the parties agreed in principle to settle the basic issues which spawned the litigation. They cannot agree, however, on what is to the court a peripheral and insubstantial question—the amount of plaintiffs' attorneys' fees to be taxed against defendants. In any event, the prolonged delay, first in reaching a settlement of the basic controversy, and now resulting from the attorneys' fees issue, continues to

defer relief to the deserving class on whose behalf the lawsuit was instituted. Accordingly, despite the court's preference for an out-of-court settlement, the rights of the plaintiff class require that the court resolve the matter without further delay.

## I

This 1977 housing discrimination case was brought pursuant to Title VIII, the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq., as well as 42 U.S.C. §§ 1981 and 1982.

The plaintiffs, Julio Huertas, Carmen Melendez, Francisco Garcia, Rosaria Esperon, Rafael Negron, Angelo Vasquez, Maria Sanchez, the Lower East Side Joint Planning Council on Housing and It's Time, Inc., sued on their own behalf and on behalf of a certified class of individuals defined as follows:

(a) all Puerto Rican, other Hispanic and Black homeseekers who have completed or will complete applications for occupancy in the cooperative apartments owned by defendants and who have been or may be denied the opportunity to purchase those apartments because of their national origin or race; and

(b) all Puerto Rican, other Hispanic and Black homeseekers who have had or will have an interest in buying a cooperative apartment owned by defendants but have been discouraged and dissuaded from completing an application to do so by any act of defendants prohibited by 42 U.S.C. §§ 1981 and 1982 and/or by 42 U.S.C. §§ 3601–3619.

Defendants Amalgamated Dwellings, Inc. ("Amalgamated"), Hillman Housing Corp. ("Hillman"), East River Housing Corp. ("East River"), and Seward Park Housing Corp. ("Seward Park") are four low-cost housing cooperatives located on Grand Street and extending from Essex Street eastward to the F.D.R. Drive.

The four cooperatives are adjacent to each other. For the most part, they are managed from one central office located at 570 Grand Street. Applications for apartments are dispensed, received and processed at that office and inquiries about apartment allocations are received and responded to there. A small branch office is located at 425 Grand Street and applications for apartments are available at that office as well.

Amalgamated, constructed pursuant to the New York Limited-Dividend Housing Companies Law, now Article IV of the Private Housing Finance Law, opened for occupancy in 1930. The three other cooperatives were constructed under the New York Redevelopment Companies Law, now Article V of the Private Housing Finance Law. Hillman opened for occupancy in 1949–51. East River opened for occupancy in 1955–56, and Seward Park opened for occupancy in 1960. The total number of residential apartments contained in the four cooperatives is 4,432.[1]

Defendant Ralph Lippman has been the Executive Manager of the Cooperatives since 1956, overseeing and controlling all administrative and management functions for the four buildings. His responsibilities include supervision of all aspects of the

---

1. The breakdown by size of apartments is as follows:

|  | Efficiency | 1 Bedroom | 2 Bedroom | 3 Bedroom | Total |
|---|---|---|---|---|---|
| Amalgamated | 3 | 110 | 99 | 23 | 235 |
| Hillman | 85 | 301 | 340 | 72 | 797 |
| East River | 82 | 721 | 769 | 100 | 1672 |
| Seward Park | 148 | 896 | 535 | 148 | 1728 |
|  | 318 | 2028 | 1743 | 343 | 4432 |
| Percent of Total | 7.15% | 45.74% | 39.35% | 7.74% | 100% |

See Joint Pre-Trial Order at ¶ 8.

application process. Mr. Lippman resided in the Amalgamated cooperative from 1941 to 1952, in the Hillman cooperative from 1952 to 1958, and has resided in the East River cooperative since 1958. He is a tenant-stockholder in that cooperative. Over the six years prior to the time of trial, he held the following positions as officer or director of the cooperatives: Vice President and Director of Amalgamated, President and Director of Hillman, President and Director of East River, and Vice President of Seward Park.

Defendant Harold Ostroff is now and has been a director of Seward Park since December, 1966. He was President of Seward Park from December, 1966 to May, 1977, and has held the title of President Emeritus of Seward Park since May, 1977. He does not now, and never has, resided in or owned stock in any of the four cooperatives, and has never been employed in the Administrative Office of the cooperatives.

Records of the rate of vacancy and turnover of apartments in the cooperatives have been researched by the parties from 1960 forward. Since 1960, apartments in the cooperatives have been vacated at an average rate of approximately 103 apartments per year, which represents an average annual turnover rate of approximately 2.3%. These figures do not include internal transfers—moves by residents from one apartment to another within the four cooperatives. When a vacancy occurs, residents who wish to transfer to different apartments are accorded priority over nonresident applicants. This has meant that virtually all vacated three-bedroom apartments are taken by residents, leaving none for outside applicants.

Since approximately 1960, the four cooperatives have received a total of approximately 10,000 applications for apartments, of which (a) almost 6,000 have become inactive, (b) approximately 2,000 have received apartments, and (c) approximately 2,000 have remained on the active waiting list as of September, 1978.

Since 1960, the cooperatives have not advertised the availability of their cooperative apartments. Indeed, the sign next to the door at the main office at 570 Grand Street reads as follows:

### COOPERATIVE VILLAGE ADMINISTRATIVE OFFICES

---

### AMALGAMATED DWELLINGS, INC. EAST RIVER HOUSING CORP. HILLMAN HOUSING CORP. SEWARD PARK HOUSING CORP.

The sign does not contain the words "Sales Office" or "Applications Office."

In April, 1978, the racial composition of the 4,432 apartments in the four cooperatives was 96.8 percent white, 1.6 percent black, 0.8 percent Hispanic, 0.5 percent Asian, and 0.4 percent mixed. *See* Table 1, *infra*, Appendix A.

As of September, 1978, the racial composition of the 2,113 applicants for apartments whose applications remained active was 75.8 percent white, 8.5 percent black, 10.2 percent Hispanic, 5.2 percent Asian, and 0.4 percent mixed. The racial composition classified by requested apartment size is set out in Table 2, *infra*, Appendix A.

As of September, 1978, according to defendants, the racial composition of the applicants in the inactive application files was 90.7 percent white, 3.5 percent black, 3.5 percent Hispanic, 2.0 percent Asian, and 0.3 percent mixed. Racial composition classified by apartment size is set out in Table 3, *infra*, Appendix A.

The racial composition of the 1,985 apartments occupied by individuals who moved into the four cooperatives during the period January 1, 1960, through December 31, 1978, was 94.8 percent white, 1.8 percent black, 1.7 percent Hispanic, 0.7 percent Asian, and 1.0 percent mixed. Racial composition is classified in Table 4 according to the size of the apartment allocated. *See* Table 4, *infra*, Appendix A.

Plaintiff Carmen Melendez applied for a one-bedroom apartment on April 9, 1973. She was offered an apartment by defendants in July, 1978, after the lawsuit had commenced, which she refused because the bedroom was too small. She was offered

another apartment in August, 1978, which she accepted. She is now residing in East River.

Plaintiff Francisco Garcia applied for a two-bedroom apartment on April 28, 1969. He also was offered an apartment in July, 1978, which he refused because defendants prohibit dogs in the apartments. Garcia has agreed that his application should be treated as inactive until he notifies the defendants that he no longer has a dog.

Plaintiffs Maria Sanchez and Julio Huertas each applied for two-bedroom apartments on November 10, 1976. From the date of their applications to the filing of this lawsuit on September 12, 1977, two-bedroom apartments were offered to four white applicants and one Hispanic applicant, all of whose applications postdated the applications of Sanchez and Huertas. Three white applicants rejected the offers, while the remaining white and the Hispanic applicant accepted.

Plaintiff Rosaria Esperon applied for a three-bedroom apartment on September 27, 1976; plaintiff Raphael Negron applied for a three-bedroom apartment on September 28, 1976; plaintiff Angelo Vasquez applied for a three-bedroom apartment on November 10, 1976; and former plaintiffs Betty Robinson and Joyce Johnson applied for three-bedroom apartments on August 29, 1977. No three-bedroom apartments have been allocated to any non-residents since these applications were filed.

These recited facts are undisputed and are a part of the Joint Pre-trial Order. *See* Joint Pre-trial Order at 1–9 *passim.* At trial plaintiffs established through testimony of witnesses and exhibits that defendants engaged in policies and practices that constituted disparate treatment of black and Hispanic applicants for apartments in the cooperative, or resulted in a disparate impact against black and Hispanic applicants. While the discriminatory policies and practices were not explicitly racial in design, they had a racially discriminatory effect sufficient to establish a prima facie violation of Title VIII, *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1036–38 (2d Cir.1979); *Village of Arlington Heights v.* *Metropolitan Housing Development Corp.,* 558 F.2d 1283, 1290 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978), and were evidence of intentional, racially discriminatory treatment of black and Hispanic applicants sufficient to establish prima facie violations of §§ 1981 and 1982. *General Building Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 382–91, 102 S.Ct. 3141, 3145–50, 73 L.Ed.2d 835 (1982) (§ 1981); *Guardians Association v. Civil Service Commission,* 633 F.2d 232, 263–68 (2d Cir.1980), *aff'd,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (§ 1981); *City of Memphis v. Greene,* 451 U.S. 100, 120–23, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981) (§ 1982).

The processing of applicants was handled by Ralph Lippman and Anne Mildworm (Trial Transcript ("Tr.") 25–26) until 1976, and thereafter by Lippman and Natalie Korn (Tr. 759). The original residents of the four cooperatives were overwhelmingly white, and over the years few black or Hispanic applicants succeeded in securing apartments. There was no public solicitation. Information about a vacancy was secured by word of mouth. This, of course, favored residents and disfavored outsiders.

Black and Hispanic applicants were discouraged from applying. They were told of a long waiting list, the low turnover rate and that there might be a twenty-year delay before their applications would be reached. (Tr. 258). The named plaintiffs and members of the class, specifically Negron (Tr. 122–25), Vasquez (Tr. 137–38), April and Jonathan Lewis (Tr. 142–43), Soto (Tr. 253–54), Urdaneta (Tr. 258), Samuel Licona and his wife (Tr. 262–63), Esperon (Tr. 270–72) and others (Tr. 448), were discouraged from applying. Carmen Melendez, a named plaintiff, was denied an application (Tr. 86–88), as was Anna Soto, a member of the class. (Tr. 253–54).

The Mildworm-Lippman stated allocation policy was to give priority to young people, newlyweds and children of residents. There was also testimony that priority was given to those in need. (Tr. 44–45). However, what comes across most

vividly from the evidentiary proof is that whatever these criteria, white applicants had the inside track and received offers for apartments before blacks or Puerto Ricans, despite age, lack of need, or position on the waiting list. White applicants may have had priority over other white applicants based on these criteria, but as between white applicants and black or Hispanic applicants, the criteria were inoperative. The white applicant was accorded priority.

When an apartment became available to an outside applicant, Mildworm would pull out 20 to 25 applications from the particular room-size file. (Tr. 44–45). In selecting applicants from the specific file, Mildworm chose applicants who fit any of the aforementioned priority categories.

When Mildworm chose applicants, she exercised flexibility with regard to either the choice of the building or floor that an applicant had indicated on his or her application. An applicant's salary was also viewed with flexibility, particularly in the case of young applicants. (Tr. 47, 50–53). No priority was given to persons who had lived on the Lower East Side as opposed to persons who had lived elsewhere. (Tr. 48–49). The initial selection process often took most of the day to accomplish. (Tr. 45). Once Mildworm had selected the 20–25 applications, she would meet with Lippman in order to review the applications. (Tr. 50, 52). Upon reviewing the 20–25 applications, Lippman would also apply the priorities. Young applicants would be chosen primarily on the basis of the order in which they filed their applications. (Tr. 50–52).

Lippman concedes that the selection of future tenants was an imprecise operation. The criteria used were applied neither uniformly nor consistently. (Tr. 822–24). Lippman applied a subjective criterion as well, i.e., who "would be most effective within the community." (Tr. 931). The race and ethnicity of the applicants were usually discernible because of the ability to identify Jewish and Hispanic surnames, as well as clues evident from references and addresses. (Tr. 1120, 1123).

From 1960 to the initiation of the lawsuit on September 12, 1977, defendants allocated apartments to 53 black and Hispanic families. (Plaintiffs' ("P.") Exh. 36, Table 3). Since the initiation of the lawsuit and through 1980, defendants allocated apartments to 57 black and Hispanic families. (P. Exh. 36, Table 3).

Individual minority applicants were not allotted priority in accordance with defendants' stated procedures. Minority applicants were passed over for whites with less priority or no priority at all. All of the named plaintiffs were young persons when they applied or attempted to apply. None was given priority as a young person, and all were passed over for whites with fewer or no priority characteristics.

A few cogent examples will suffice. Plaintiff Julio Huertas filed an application with defendants in 1967, although he was told he would have to wait twenty years for an apartment. At that time, Huertas's family consisted of himself, his wife and his daughter, and they required a two-bedroom apartment. (Tr. 174–75). Defendants never contacted Huertas about his 1967 application and later claimed to have lost it. He was forced to file another in 1976, but was treated as a 1976 applicant consistent with defendants' practice when an applicant claimed to have previously filed an application. (Tr. 41, 177; P. Exh. 12). Since 1967, defendants have awarded apartments to white applicants who applied after Huertas. (P. Exh. 10).

Plaintiff Carmen Melendez sought to obtain an application each year, from 1967 to 1973. Each time she was denied an application. (Tr. 86–88). In 1973, white friends of Melendez obtained an application for her, which she filed immediately. (Tr. 88–89). When Melendez and her husband Edwin applied in 1973, they were 26 and 32 respectively. They were never informed of the priority category for young couples. On the contrary, when Melendez contacted the Coop offices every year to inquire about her application, she was told that no apartments were available and that the waiting list was very long. (Tr. 89).

**446**

Two-hundred-and-one white applicants who applied after Melendez obtained apartments. (P. Exh. 23). Defendants offered no explanation for this disparate treatment. Lippman denied seeing the Melendezes' application before the lawsuit. (Tr. 785, 884–85). Lippman did not know why the Melendezes were not offered any of the nine apartments offered to the Warbets, the Zaks and the Bermans, who all had applied subsequently to the Melendezes. (Tr. 883–84; P. Exhs. 74–76)

Plaintiff Francisco Garcia applied in 1969 and 1976. He was told on both occasions that no apartments were available and that he would have to wait a long time. (P. Exh. 14; Tr. 160–61). Garcia and his wife, Laura, in 1969 aged 31 and 29 respectively, had two daughters, one six years old and the other less than a year. The Garcias were in need of a two-bedroom apartment. (P. Exh. 14). Since Garcia's 1969 application, 70 apartments have been allocated to whites who applied after he did. Garcia was not offered an apartment until after the lawsuit was brought in July, 1978. (P. Exh. 25). Lippman denied seeing Garcia's application before the lawsuit (Tr. 783–85), and could not explain why white applications were processed before his.

Plaintiff Esperon obtained an application in 1972, but was discouraged from applying when she was told that no apartments were available and that she would have to wait ten years. (Tr. 271–72). In 1976, Esperon filed an application. On inquiring about her application in 1977, she was told that there was a long waiting list. (P. Exh. 15; Tr. 273).

Plaintiff Rafael Negron sought to apply to the cooperatives in 1967, but was told that no apartments were available and that he would have to wait ten years. (Tr. 122–24). In 1976, Negron filed an application. Again he was informed that there was a ten-year wait for an apartment. He has never been contacted by the cooperatives about his application. (P. Exh. 16; Tr. 125).

Plaintiff Angelo Vasquez, who has lived near the cooperatives for 25 years, filed an application in 1976. He testified that he had not applied earlier but he "knew it was hard, if not impossible, for any minority to get an apartment there." (Tr. 137). Vasquez has lived in the area for 25 years and is active in community organizations in the Lower East Side community. (Tr. 133–34). The response to a subsequent inquiry about his application was that it would take forever to get into the cooperatives. (Tr. 139–40).

Plaintiff Maria Sanchez filed an application in 1976. At that time she had an urgent housing need, since she and her children were living in substandard housing, next to an abandoned building that was regularly set on fire. (Tr. 108–09). Frederic Seiden, a white neighbor, was offered an apartment within months, as were the Khayyats, another white family; other subsequent white applicants also were offered an apartment within months of their application. (P. Exhs. 10, 27). The Khayyats do not fit into any priority category, whereas Sanchez met the need criterion. However, she was not offered an apartment until 1979, after the lawsuit was filed.

Samuel Licona, a Hispanic, sought to apply for an apartment in 1969. At that time he informed defendants that he was to be married in three months. In 1969 he was 27 and his future wife was 21. (Tr. 263). Licona was told that there was a six-to-eight-year waiting list and he was discouraged from applying. In May, 1978, Licona applied again. He had not heard from the defendants as of the date of trial. (Tr. 264).

Albert Urdaneta, a Hispanic, attempted to apply in 1973. At that time he lived in a substandard dwelling in a crime-ridden community. (Tr. 257–58). He became discouraged from applying when he was told by defendants that he would have to wait nine to twenty years. (Tr. 258). In 1979, Melendez told Urdaneta that she had obtained an apartment. He then filed an application. (Tr. 259).

April and Jonathan Lewis, a black couple, applied in 1973. At that time they were 24 and 25 respectively, had one child and were expecting another. After several

futile attempts by the Lewises to speak with Lippman, Lewis stated that he believed they were being discriminated against because of their race. Lippman then spoke to him and assured him that there was no discrimination and "no one had gotten in outside of [their] date of the application, it goes in chronological order." At a subsequent meeting with Lippman, the Lewises again were told that "people are not taken out of sequence, that they are taken according to the date of the application." (Tr. 148–52). The Lewises have never been offered an apartment, and believed that applications were being processed chronologically and that in this process their application would at some point reach the top of the list. (Tr. 151–52). However, twenty-four white applicants who applied after them have obtained apartments.

Anna Soto, a Hispanic, attempted to apply in 1971, three weeks before her wedding. Soto was told that no applications were being given out because there was a waiting list of eight to ten years. (Tr. 253–54). She was not told that young couples were given priority. (Tr. 254).

In 1960, Noah Greene, a black, visited the administrative office to apply for an apartment. He was told that he would need a deposit of $500 in order to obtain an application. (Tr. 195). In 1964, Greene inquired about the status of his application and informed the office of his change of address. Despite his having done so, in 1967, a communication was sent to his previous address and returned to the defendants stamped "Addressee unknown." (P. Exh. 19; Tr. 196). In 1969, Greene contacted the office again to inquire about his application. Greene was first told that no application was on file, but he insisted otherwise and the application was later found. (Tr. 197). Between April 30, 1969, and May 15, 1969, Greene wrote Lippman documenting what Greene regarded as discriminatory treatment by Lippman's staff dating back to his initial contact with the office. (P. Exh. 19). When Greene received what he felt were unsatisfactory responses to his letters, he decided to file a complaint with the Human Rights Commission alleging discrimination on the basis of race. (Tr. 201–02). At that point, Lippman offered Louis Greene, Greene's brother, and his family an apartment. Louis Greene and his family moved into the apartment in January, 1970 (Tr. 202–03; P. Exh. 10; Tr. 924–25), and Greene dropped his complaint.

Joel and Elkie Price, a young white couple aged 30 and 29 respectively, applied for a one-bedroom apartment on July 7, 1976. They obtained an apartment in Amalgamated on September 14, 1976. (P. Exhs. 10, 43). Robert and Jeannie Torres, a young Hispanic couple aged 23 and 18 respectively, applied for a one-bedroom apartment on February 20, 1974. Their application remained in the active file until 1977. They were never offered an apartment. (P. Exh. 44; Tr. 821). Lippman did not recall seeing the Torres application and did not know why the Torres family was not offered the apartment obtained by the Price family. (Tr. 821–27).

Robin Solomon and Nicholas Padula, a young white couple about to be married, both aged 23, applied for a one-bedroom apartment on October 25, 1976. On July 21, 1977, they were offered and refused an apartment in East River and on September 8, 1977, they were offered and refused an apartment in Seward Park. They eventually accepted an apartment in Hillman on December 1, 1977. (P. Exhs. 10, 45). Frank and Marisa Rios, a young Hispanic couple, aged 23 and 20 respectively, applied for a one-bedroom apartment on December 11, 1975. They were then living with the husband's parents under very crowded conditions. They were never offered an apartment. (P. Exh. 46). Lippman could not explain why the Rios family was not offered any of the three apartments offered to the Padula family. (Tr. 830).

Marsha and Sidney Schneck, a young white couple aged 29 and 32 respectively, applied for a one-bedroom apartment on April 14, 1977. On December 1, 1977, they were offered an apartment in Amalgamated Dwellings which they refused. (P. Exh. 47). Gabriel and Alice Gonzalez, a young Hispanic couple both aged 27, applied for a one-bedroom apartment on July 19, 1976.

(P. Exh. 48). They were never contacted. Lippman did not recall seeing the Gonzalez application and could not explain why the Gonzalez family was not offered the apartment later offered to the Schnecks. (Tr. 833–36).

Charles and Malka Feit, a young white couple both aged 27, applied for a one-bedroom apartment on October 24, 1977. The Feit family obtained an apartment in Seward Park on December 13, 1977. (P. Exhs. 10, 49). Isaias and Wanda Mieles Perez, a young Hispanic couple aged 24 and 17 respectively, applied for a one-bedroom apartment on June 22, 1976. They have never been offered an apartment. (P. Exh. 50).

Michael Berman, a young white single applicant aged 34, applied for a one-bedroom apartment on May 8, 1973. He obtained an apartment in Seward Park on September 1, 1975. (P. Exhs. 10, 51). Jose and Milagros Vegas, a young Hispanic couple aged 32 and 29 respectively, applied for a one-bedroom apartment on February 9, 1973. Their application remained in the active file until February, 1977. (P. Exh. 52). Lippman recalled the allocation to Michael Berman and stated that Berman's ability to pay for such an expensive apartment influenced the decision to allocate that apartment to him. Berman projected earnings of $13,000 for 1974. The Vegas family projected earnings of $17,000 for 1974. (Tr. 840–41; P. Exhs. 51, 52). Both Berman and the Vegas family fit the priority category for young people. The Vegas family applied before Berman, had great need for an apartment, and reported a higher income than Berman. Lippman did not recall seeing the Vegas application and did not know why the Vegas family was not offered the apartment obtained by Berman. (Tr. 842).

Jacob and Esther Wiesel, a young white couple both aged 26, applied for a one-bedroom apartment on July 31, 1976. They obtained an apartment in Hillman on December 1, 1976. (P. Exhs. 10, 53). Peter and Maria Cooper, a young black couple aged 21 and 20 respectively, applied for a one-bedroom apartment on March 15, 1973.

(P. Exh. 54). Even though the Coopers submitted an update form on April 25, 1977, indicating continued interest, their application was placed in the inactive file. (Tr. 844–45; P. Exh. 9). Lippman does not recall seeing the Cooper application and could not explain why the Weisels were offered an apartment while the Cooper application was placed on inactive status. (Tr. 844–45).

Gary Wiseltier, a young white single applicant aged 27, applied for a one-bedroom apartment on March 1, 1976, and obtained an apartment in Seward Park on March 1, 1977. (P. Exhs. 10, 55). As of April, 1978, the basic carrying charges for the apartment allocated to Wiseltier, in Seward Park, were $184.75. (Tr. 847–48; P. Exh. 11). Nemias and Diane Otero, a young Hispanic couple aged 28 and 22 respectively, applied for a one-bedroom apartment on June 3, 1975. Their update form dated February 2, 1977, reports a willingness to pay up to $200.00 for an apartment. They were never contacted. (P. Exh. 56; Tr. 848–50). Lippman did not recall seeing the Otero application, but stated that a possible reason why Wiseltier was offered the apartment while the Oteros were not was that the latter could not afford such an expensive apartment. However, the apartment awarded to Wiseltier had carrying charges less than the limit the Oteros had indicated they could afford.

Robert Kunkis, a young white applicant aged 23, applied for a one-bedroom apartment on August 1, 1973. He obtained an apartment in Seward Park on February 7, 1976. (P. Exhs. 10, 57). Ida Gomez, a young Hispanic applicant aged 21, applied for a one-bedroom apartment on April 1, 1971. Her application remained in the active file until April, 1977. Lippman could not recall seeing the Gomez application and could not explain why Kunkis was offered an apartment and Gomez was not. (Tr. 853).

Paul and Lillian Burstein, a white couple, applied for a one-bedroom apartment on July 16, 1973. They were allocated an apartment in Seward Park by April 19, 1975. (P. Exhs. 10, 59). The Bursteins

reported a total income of $21,500 (Tr. 859), but after they were offered the apartment, they verified a total income of $10,552. (P. Exh. 59).

Roberto Gonzalez, a Hispanic applicant, applied for a one-bedroom apartment on October 8, 1970. Gonzalez reported an income of $8,500 and current rent of $160. His application remained active until April, 1977. During that time, Gonzalez was never contacted for an apartment. (P. Exh. 60). William Brown, a black applicant, applied for a one-bedroom apartment on May 23, 1972. His application remained in the active file until April, 1977. Brown reported an income of $8,920 and his rent in 1972 was $165. (P. Exh. 61). During the time that the application remained active, Brown was never contacted about the availability of an apartment.

Lippman did not recall seeing the applications of Gonzalez or Brown. The basic carrying charges to the Bursteins for the apartment allocated to them totalled $154.35. (P. Exh. 59). Lippman stated that both Gonzalez and Brown may not have been able to meet the carrying charges and the Bursteins' apparent ability to afford one of the most expensive apartments available may have influenced the decision to give the apartment to them. (Tr. 856–57, 860). Brown and Gonzalez were both single and had incomes in 1970 and 1972 which were almost equivalent to the Bursteins' $10,522 income in 1975, and the rent they were already paying was higher than the carrying charges for the apartment given to the Bursteins. (P.Exhs. 60, 61; Tr. 858).

Charles Vena, a white applicant, applied for a one-bedroom apartment on July 8, 1974. Vena clearly specified an interest in obtaining an apartment in Seward Park. Despite his stated preference, Vena was offered an apartment in East River on February 2, 1976, and another in Hillman on July 26, 1978. He refused both apartments. (P. Exh. 62). Edwin Ortiz, a young Hispanic applicant aged 22, applied for a one-bedroom apartment on July 21, 1966. He specified an interest in East River and Hillman. Ortiz's application remained in the active file until May, 1977, but he was never offered an apartment. (P. Exh. 63). Lippman did not recall seeing the Ortiz application. He could not explain why Ortiz was not offered the apartments in East River and Hillman in which he had expressed an interest, while apartments in these buildings were offered to Charles Vena who refused them. (Tr. 864).

Karen Dern, a white single parent, applied for a two-bedroom apartment on August 30, 1975. She was allocated an apartment in East River by August 1, 1976. (P. Exhs. 10, 64). Lippman asserted that Karen Dern fit the priority category of need. She was a recent divorcee, a prior resident of the cooperatives, now living in New Jersey, who wanted to move back to the cooperatives. (Tr. 867–68). Diane Dawson, a black single parent, applied for a two-bedroom apartment on June 14, 1972. Her need was great because she and her child were living with four other persons in a 4½ room apartment. (P. Exh. 65). She was not offered an apartment. Juanita Ferguson, another black single parent, applied for a two-bedroom apartment on August 21, 1972. Her need was great since she and her two children were living in her parents' apartment, sharing one bedroom. She was not offered an apartment. (P. Exh. 65; Tr. 798–99).

Sam and Gladys Chesler, a white couple, applied for a one-bedroom apartment on April 5, 1974. The Cheslers obtained an apartment in Seward Park by November 1, 1976. (P. Exhs. 10, 66). Martin and Bernice Strum, a white couple, applied for a one-bedroom apartment on November 1, 1974. The Strums were offered an apartment in East River on August 6, 1977. (P. Exh. 67). Neither the Cheslers nor the Strums fit any of the priority categories. (Tr. 870–71). Ellis and Mary Turner, a black couple, applied for a two-bedroom apartment on August 14, 1969. As of June 7, 1974, they needed a one-bedroom apartment. On June 1, 1978, after this lawsuit had commenced, the Turners were offered an apartment, but due to the recent death of her husband, the widow rejected the offer. (P. Exh. 68). Rebecca Stockton, a black applicant, applied for a one-bedroom

**450**

apartment on June 30, 1973. Ms. Stockton was never contacted about the availability of an apartment. Lippman did not recall seeing the Turner or Stockton applications, and he did not know why the Turners and Stocktons were not offered apartments while the two white couples were readily assigned apartments. (Tr. 872–73).

Morris and Florence Rosenberg, a white couple, applied for a one-bedroom apartment on May 4, 1976. They were allocated an apartment in Hillman by February 1, 1977. (P. Exh. 10). Seth and Anna Taylor, a black couple, applied for a one-bedroom apartment on October 1, 1970. They had need for an apartment due to the deteriorating conditions of their current residence (P. Exh. 71), but heard nothing until February, 1979, after the lawsuit had begun. Only then did the Taylors obtain an apartment. (Tr. 877). Henry and Dorothy Ashton, a black couple, applied for a one-bedroom apartment on April 25, 1973. In December, 1978, after the lawsuit had begun, the Ashtons obtained an apartment. (P. Exh. 73; Tr. 877). Steven and Toby Warbet, a young white couple aged 28 and 22 respectively, applied for a one-bedroom apartment on August 12, 1974. On March 17, 1975, they were offered an apartment in East River or Seward Park. Subsequently, on April 30, 1975, they were offered another apartment in Seward Park. On June 6, 1975, they obtained an apartment in East River. (P. Exhs. 10, 74). Elliott and Etella Zak, a young white couple aged 30 and 23 respectively, applied for a one-bedroom apartment on January 24, 1974. The Zaks were allocated an apartment in Seward Park on November 12, 1975. (P. Exhs. 10, 75). Linda and Gerald Berman, a young white couple aged 29 and 33 respectively, applied for a one-bedroom apartment on March 17, 1975. The Bermans were offered four apartments, on March 29, 1975, June 27, 1975, July 31, 1975, and June 10, 1977, all of which they refused. The Bermans were both children of co-operators. (P. Exh. 76). Martin and Bonnie Schwebel, a young white couple both aged 27, applied for a one-bedroom apartment on July 27, 1976. They were allocated an apartment on October 14, 1977. (P. Exhs. 10, 77). Aida and Santos Martinez, a young Hispanic couple aged 22 and 32 respectively, applied for a one-bedroom apartment on April 18, 1973. Their application remained in the active file until January, 1977, but no offer of an apartment resulted. (P. Exh. 78). The Warbets, the Zaks, the Bermans, the Schwebels and the Martinezes all fit the priority category of youth. The Martinez application came first, but while some apartments were offered to the four white couples, none were offered to the Martinezes. Lippman had no explanation for this. (Tr. 883).

The pattern of ignoring the applications of blacks and Hispanics but readily finding apartments for white applicants is fixed and persistent. Compare the treatment of Jack Ostrow, a white, who was offered an apartment within a year (P. Exh. 79), to that of Maria Lozada, a Hispanic (P. Exh. 80), and Betty Christmas, a black (P. Exh. 81). The Lozada and Christmas applications predated Ostrow's, but the women heard nothing.

Compare the handling of the applications of Samuel and Eva Abramowitz (P. Exh. 82), Max and Freida Boimal (P. Exhs. 10, 82), Joseph and Lucy Schleisser (P. Exhs. 10, 82), Lee Lifschitz and Kalman Lasky (P. Exh. 82), Harman Berger (P. Exh. 82), Bernard and Laura Feierstein (P. Exh. 82), Dora Benjamin (P. Exh. 82), Abraham and Hilda Cassila (P. Exh. 82), all of whom are white and were offered apartments, to that of Anibal and Luz Montalvo, Hispanic, and Morris and Delores Thomas, black, who were never contacted. (P. Exhs. 83–84). The Montalvos were the first of these applicants. The Thomas application was subsequent to the Abramowitz, Boimal, and Schliesser applications but prior to the applications of the other whites in this grouping.

Philip and Mauve Levine, a white couple whose application for a two-bedroom unit postdated that of Joseph and Rose Cortijo, a Hispanic couple, were offered an apartment in Seward Park, while the Cortijos never heard from Lippman. (P. Exhs. 85, 86; Tr. 896–98).

Simon and Viva Khayyat, white applicants for a two-bedroom unit, received an apartment within less than four months. (P. Exhs. 10, 87). Barbara Allen, a single black parent with two daughters, applied for a two-bedroom unit over a year before the Khayyats. Her application stressed a dire need: "My daughter was robbed in the elevator, and I myself was held up and robbed at knife point. My two children and myself live in constant fear of being sexually assaulted in elevators, hallways and the lobby." She never heard from defendants. (P. Exh. 88). The Khayyats expressed no such extraordinary need and did not fit into any priority category. (Tr. 898–900).

Compare Sarah Feinberg, a single white parent, and Irving and Rosalyn Marder, a white couple, all of whom were offered apartments (P. Exh. 89; Tr. 905), with Lucy Caballer, a Hispanic, and Louise Hudson, a black (P. Exhs. 90, 91), whose applications predated the two white applications, but who were never contacted. Consider also Angel and Iris Gavin, Rafael Hilda Rodriguez, and Manuel and Virginia Fargas, Hispanics who applied for apartments in Amalgamated before the two white applicants. (P. Exh. 92). The three Hispanic applicants had listed Amalgamated as their preferences but were not contacted, while the subsequent white applicants were offered apartments there.

Allan and Rochelle Epstein, white, applied for a two-bedroom apartment and received an apartment in Seward Park within a year (P. Exhs. 10, 93), while Enriquez and Consuela Flores, Adoriano and Sulema Medina, Adalberto and Luz Padilla, Dolores and Pedro de Armas, Juan and Teresa Rivera, all Hispanic, and Lionel and Catherine Agard, black (P. Exh. 94), had their applications on file some six years before the Epsteins applied. They were never contacted during the period June 20, 1968, when the earliest application was made by the Agards, through June 25, 1976, when the Epsteins were allocated a unit in Seward Park; nor were they contacted thereafter.

Frances Marino, a white single parent, applied for a two-bedroom apartment on April 11, 1974. She was on public assistance. She was awarded an apartment in Seward Park on October 28, 1977. (P. Exhs. 10, 96). Lippman at first turned down the application, but the applicant's father, a resident of the cooperatives, offered to pay the equity costs required. No Hispanic or black single female parent has ever been offered or allocated an apartment in the cooperative. (Tr. 917–18).

Frederic Seiden testified concerning meeting Sol Mildworm, Vice President of East River and husband to Anna Mildworm, who until 1976 processed the applications. Seiden works for the Department of Social Services. His job requires him to make visits and arrange home care for the elderly. On March 3, 1976, he made a home visit to Sol Mildworm's mother, Annie Mildworm, and Sol Mildworm was present at the time. (Tr. 213–14). Sol Mildworm encouraged Seiden to apply, informing him of the priority given to young people (Tr. 215, 676), a fact not generally known (Tr. 50–55). He told Seiden that he could get him an apartment. Seiden pointed out that there was a ten-year waiting list, but Mildworm advised him that the list could be bypassed. Seiden applied and was offered an apartment within five months. (Tr. 216; P. Exh. 21).

The two men met again on March 31, 1976. During the course of their conversation, Seiden inquired about black occupancy of the cooperatives. Mildworm said there were "some colored families you wouldn't mind living next door to," but the "buildings are 90 percent Jewish, 9 percent Italian, 1 percent black and Puerto Rican and we intend to keep it that way." (Tr. 220). Mildworm denied making the statement (Tr. 661), and generally disputes Seiden's account. He kept no notes, however, whereas Seiden kept detailed notes of these encounters. (Tr. 235–37, 677). Moreover, his application was processed very quickly. I credit Seiden's testimony.

All the facts set out above were established at trial in 1981. Although they are roughly seven years old, these facts remain

accurate for all relevant purposes. There have been substantially no changes effected in minority occupancy since the trial. Although agreement was reached for allocation of substantially more apartments to the class over time, defendants have not as yet operated under any new timetable.

Plaintiffs presented expert testimony by Dr. Sara McLafferty, a social and economic geographer. Dr. McLafferty analyzed 1970 census data for New York City and the Lower East Side, the 1976 Survey of Income and Education for New York, and 1970 and 1976 population data concerning household size. From these sources she derived an expected applicant pool to determine the expected number of cooperative minority residents and applicants. In comparing the expected and actual numbers of blacks and Hispanics who had apartments allocated to them during the years 1962 through 1978, and who applied for apartments during the years 1960 through 1978, she found a statistically significant disparity between what was expected and what was found. She testified that except for the cooperatives, the Lower East Side had been an integrated community throughout the relevant time period (Tr. 502), with minorities representing 34 percent of the total population in 1960. Even taking income into account, minorities represented 28 percent of the Lower East Side Community that could afford to reside in cooperative housing. (Tr. 473). In 1950, blacks and Hispanics comprised 25 percent of the families living in housing razed to build East River and Seward Park. (See P. Exh. 32 at 48; Tr. 576–77). Dr. McLafferty concluded that absent discrimination the cooperatives would have 35 percent minority occupancy.

Plaintiffs introduced testimony in this connection showing that minorities comprised roughly 33 percent of the residents in Gouverneur Gardens, a cooperative in the area, as of 1980. (P. Exh. 39, Tr. 399–402). The initial occupancy of Masaryk Towers, another housing development in the area, was 15 percent black and 30 percent Hispanic. As of 1980, the Hispanic occupancy had risen to between 45 and 50 percent. The equity payments at Gouvern-

eur Gardens and Masaryk Towers equal those required by defendants, and the monthly carrying charges are greater. Blacks and Hispanics comprise 70 percent of the tenants in Grand Street Guild Homes, a rental complex with rents above the carrying charges for the cooperatives. (Tr. 523–26).

Richard Faust, a sociologist, reviewed the data reflecting the ethnicity of applicants from 1960 through 1978 and of those who secured apartments during that period. He found a statistically significant disparity between the expected and actual numbers of minority tenants. (Tr. 318–19). Taking the period 1975 through 1978, he determined, based on the percentage of minorities with housing applications which were active, how many minorities would be expected to obtain apartments. When Faust compared the actual and expected percentages, he found a continuing disparate impact. (P. Exh. 36, Table 2; Tr. 323–324).

Dr. Bruce Levin, a statistical expert, testified that taking into account the dates of all the applications listed by defendants for the period 1960 through 1978 (see Defendants' ("D.") Exh. II) as well as the dates listed by defendants for all those who were allocated apartments during the same period (see D. Exh. JJ), there was a statistically significant disparity between the number of apartments that would have been allocated to minorities and the number actually allocated. The probability that this disparity would have occurred by chance was one in one-thousand. If allocations of apartments after the institution of the lawsuit are not considered, the probability is one in ten-thousand.

Dr. Ritterband, defendants' expert, testified that the vast majority of white applicants applying for efficiency and one-bedroom apartments had Jewish surnames (Tr. 1089–90); that Jews had a high propensity to want to live among Jews (Tr. 1093–94); and that Jewish religious and cultural institutions along with retail shops specializing in Kosher foods and other products traditionally sought by Jews are clustered around the cooperative neighborhood. (Tr.

1095–96, 1101–04, 1110–12, 1114). He felt the cooperatives provided a unique appeal to Jews, particularly the aged, seeking efficiency and one-bedroom apartments.

## II

It is clear from this evidence that until this litigation was instituted Lippman and Mildworm discriminated against blacks and Hispanics purposefully and specifically. Apartment allocations were not based on any consistent pattern. There were vague criteria which supposedly influenced the process, but even these criteria were not consistently employed. The process was principally subjective. White applicants were universally chosen over blacks and Hispanics, despite more pressing needs of minority applicants, earlier filing of minority applications, and other factors which should have given minority candidates priority.

Because information concerning equity requirements, vacancies, or criteria used in allocating apartments was not broadcast generally to the public, insiders were an applicant's best ally. All or principally all of the insiders were white; and they evidently served white applicants as both sources of needed information and references to Lippman and Mildworm. Blacks and Hispanics were unable to penetrate this inner circle.

The Seiden-Mildworm incident is illustrative. Seiden meets Sol Mildworm. The latter talks to Seiden and encourages him to apply. Five months later Seiden is offered an apartment.

Defendants complain about plaintiffs' experts and question their methodology. Even without reference to expert testimony, the evidence in the record—of disparity between white versus Hispanic and black occupancy, of misinformation (concerning, for example, ten-to-twenty-year waiting lists) directed at black and Hispanic applicants, of other studied efforts to discourage blacks and Hispanics from applying, of subjectivity in apartment allocations, and of the consistent priority given to white applicants—establishes conclusively that black and Hispanic applicants in general and the plaintiff class members in particular were subjected to disparate treatment in the processing of their applications and the allocation of apartments. Moreover, the subjectivity in choosing to whom to offer an apartment and the closed circle within which knowledge of apartment vacancies and selection procedures was passed gave the discrimination inherent in the process a disparate impact on blacks and Hispanics as a group. They could not penetrate the white enclave that influenced and controlled who would get an apartment. Both the disparate treatment and the disparate impact were purposeful—a deliberate effort to perpetuate overwhelmingly white and Jewish occupancy within the cooperatives.

Defendants have given no satisfactory response to plaintiffs' prima facie case. To allege a lack of intent to discriminate is insufficient and conclusory. The acts and their consequences must be measured to determine whether defendants carried their burden when it was their turn to go forward.

■ Title VIII renders it unlawful to discriminate in the sale or rental of housing because of race, color, religion, sex, or national origin. *See, e.g., Hanson v. Veterans Administration,* 800 F.2d 1381, 1386 (5th Cir.1986). The statute, together with 42 U.S.C. §§ 1981 and 1982, established a national policy barring discriminatory practices in housing. Proof of discriminatory intent is not necessary for a Title VIII violation. *Hanson v. Veterans Administration, supra,* 800 F.2d at 1386; *United States v. Marengo County Commission,* 731 F.2d 1546, 1559 n. 20 (11th Cir.), *cert. denied,* 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984); *Smith v. Town of Clarkton,* 682 F.2d 1055, 1065 (4th Cir. 1982); *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1036–37 (2d Cir.1979); *Resident Advisory Board v. Rizzo,* 564 F.2d 126, 146–48 (3d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1288–90 (7th Cir. 1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct.

752, 54 L.Ed.2d 772 (1978); *United States v. City of Black Jack,* 508 F.2d 1179, 1184–85 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975).

■ The purpose of Title VIII is "to provide, within constitutional limitations, for fair housing throughout the United States," 42 U.S.C. § 3601, and courts have applied Title VIII broadly within its terms. *See, e.g., Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Metropolitan Housing Development Corp., supra,* 558 F.2d at 1289–90. Title VIII prohibits not only such discriminatory conduct as is motivated by racial animus, but also any practices with significant discriminatory effects. *Hanson v. Veterans Administration, supra,* 800 F.2d at 1386; *Halet v. Wend Investment Co.,* 672 F.2d 1305, 1311 (9th Cir.1982); *Woods-Drake v. Lundy,* 667 F.2d 1198, 1201 (5th Cir.1982). The Act is violated by "discriminatory actions, or certain actions with · discriminatory effects, that affect the availability of housing." *Southend Neighborhood Improvement Ass'n v. County of St. Clair,* 743 F.2d 1207, 1210 (7th Cir.1984).

■ Except for the required showing of discriminatory intent in actions under §§ 1981 and 1982, *see, e.g., General Building Contractors Ass'n v. Pennsylvania, supra,* 458 U.S. at 382–91, 102 S.Ct. at 3145–50; *City of Memphis v. Greene, supra,* 451 U.S. at 120–23, 101 S.Ct. at 1596–98, the standard of proof applicable in §§ 1981 and 1982 actions is equally applicable to Title VIII claims. *Selden Apartments v. United States Department of Housing & Urban Development,* 785 F.2d 152, 159 (6th Cir.1986). The three-part test of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed. 2d 668 (1973), governs: (1) whether the claimant is a member of a racial minority (the named plaintiffs, except for It's Time, Inc. and the Lower East Side Joint Planning Council on Housing,[2] are blacks and Hispanics); (2) whether the claimant applied for and was qualified to rent or purchase housing controlled by defendants (plaintiff organizations and many class members meet this criterion directly, while other class members have testified that but for defendants' unlawful discouragement, they would have sought to rent or purchase); and (3) whether he or she nevertheless was rejected and the housing was made available to whites (plaintiffs have provided evidence of such consistent occurrences). *Phiffer v. Proud Parrot Motor Hotel, Inc.,* 648 F.2d 548, 551 (9th Cir.1980) (§ 1982); *Robinson v. 12 Lofts Realty, Inc., supra,* 610 F.2d at 1038 (Title VIII).

■ As plaintiffs have met their burden of establishing a prima facie case of discrimination, the burden shifts to defendants "to articulate some legitimate, nondiscriminatory reason" for their action. *McDonnell Douglas Corp., supra,* 411 U.S. at 802, 93 S.Ct. at 1824; *see Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). Defendants have not really sought to establish an absence of discrimination. The bulk of their defense seems to be that the discrimination resulted because Jewish cultural institutions and retail shops were clustered near the site of the cooperatives, and Jewish people wished to congregate together. (Ritterband and Post-Trial Memo at 171). The defendants contend "that many neighborhoods are racial or ethnic enclaves [because] those who seek housing in such neighborhoods will be of the same race or ethnic group that already predominates," *id.* at 148, and thus "any sociologist would have expected the racial and ethnic make up of [the 10,000 applicants who applied between 1960–1978] to be heavily influenced by the existing racial and ethnic make up of the Cooperatives—and that is exactly what happened." D. Post-Trial Memo at 148.

---

**2.** *See NAACP v. Alabama,* 357 U.S. 449, 458–60, 78 S.Ct. 1163, 1169–70, 2 L.Ed.2d 1488 (1958) (organization may stand in place of and represent members); *Coles v. Havens Realty Corp.,* 633 F.2d 384, 390–91 (4th Cir.1980), *aff'd in part, rev'd in part on other grounds, Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378–79, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982).

"The 12 apartment buildings, 2 garages, power plant and shopping centers that make up the Cooperatives together with the adjoining shops and institutions constitute a neighborhood of their own, populated by 4,432 households containing perhaps 15,000 people.... Since 1960, this neighborhood has been more than 95 percent white and heavily Jewish. Since 1960 the Cooperatives have had a turnover rate averaging only 2.3 percent per year. Whites, and particularly Jews, see it as an especially desirable place to live and apply there in unusually high numbers. Blacks and Hispanics do not view it as so highly desirable and some numbers of them may even reject it as undesirable." D. Post-Trial Memo at 149 (citing testimony of Ritterband, Tr. 1090–92 and two articles).

Aside from the dubious social scientific support for this self-serving statement, it hardly responds to the claim that blacks and Hispanics who acted contrary to Ritterband's racial profile were discouraged by Mildworm and Lippman or rejected or passed over continuously because of race until this lawsuit was instituted in 1978.

Defendants have not met their burden of establishing a credible nondiscriminatory basis for their action, and plaintiffs have established conclusively that racial discrimination motivated defendants' actions. Defendants have made deliberate misrepresentations to plaintiffs and members of the class about the availability of housing in the cooperatives. This in itself violates § 3604 of Title VIII. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–74 & n. 14, 102 S.Ct. 1114, 1122 & n. 14, 71 L.Ed.2d 214 (1982). In telling minority applicants (or would-be minority applicants) that there would be a 20–year wait for apartments, and that applications were taken in order, defendants misrepresented the facts.

Moreover, the evidence in the record further discloses purposeful and intentional, not inadvertent, discrimination. As has been noted, such proof of intent to discriminate is necessary to establish violations under §§ 1981 and 1982. *E.g., General Contractors Ass'n v. Pennsylvania, supra,* 458 U.S. at 382–91, 102 S.Ct. at 3145–

50; *City of Memphis v. Greene, supra,* 451 U.S. at 120–23, 101 S.Ct. at 1596–98. "[D]etermining the existence of a discriminatory purpose 'demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Rogers v. Lodge,* 458 U.S. 613, 618, 102 S.Ct. 3272, 3276, 73 L.Ed.2d 1012 (1982) (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977)). The "totality of the relevant facts" must be examined to determine whether a discriminatory purpose may legitimately be inferred. *Rogers v. Lodge, supra,* 458 U.S. at 618, 102 S.Ct. at 3276; *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976). "Adherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence upon racial imbalance ... is one factor among many others which may be considered by a court in determining whether an inference of segregative intent should be drawn." *Columbus Board of Education v. Penick,* 443 U.S. 449, 465, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979) (quotation omitted). The inquiry is a practical one designed to ascertain whether the action could not "reasonably be explained without reference to racial concerns." *Id.* at 461, 99 S.Ct. at 2948 (quotation omitted). *See Clients' Council v. Pierce,* 711 F.2d 1406, 1409 (8th Cir.1983).

Defendants' actions meet these yardsticks of purposefulness. The cooperatives start with 94 percent white occupancy. There are no advertisements of vacancies to the public. Knowledge of vacancies is gleaned by word of mouth which keeps the knowledge within this 94 percent white enclave. The parties in charge of allocation have vague standards which they apply when it suits them. Lippman and Mildworm felt the need to get a goodly number of young people in the cooperatives, and the young people with the best opportunity were the sons and daughters of cooperative residents. It is clear that those with power in the cooperatives were able to get their favored applicant moved ahead of others. In the final analysis, as the pattern of selec-

tion demonstrates, Lippman and Mildworm invariably and relentlessly chose white applicants over blacks or Hispanics. Viewing the process in its totality, one can fairly reach only one conclusion: Lippman and Mildworm operated deliberately to keep the cooperatives 94 percent white and discriminated by race in their initial selections. Word-of-mouth procedures then perpetuated the initial discrimination. *See Franks v. Bowman Transportation Co.*, 495 F.2d 398, 419 (5th Cir.1974), *rev'd on other grounds*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Parham v. South-Western Bell Telephone Co.*, 433 F.2d 421, 426–27 (8th Cir.1970); *see also Abron v. Black & Decker (U.S.) Inc.*, 654 F.2d 951, 956–57 (4th Cir.1981) (Murnaghan, J., dissenting). These practices have established both disparate treatment and disparate impact.

■ The court adopts as its judgment in this case the settlement agreement approved October 15, 1986. In addition, however, to protect the class, the court enjoins defendants from imposing any new requirements (including but not limited to increased equity costs) upon class member applicants as conditions to their securing apartments. The class members are to be admitted subject to the terms and conditions operative as of May 6, 1987.

Plaintiffs' counsel are entitled to attorneys' fees and fees are awarded in accordance with the court's opinion of February 28, 1986. Plaintiffs' costs and expenses, however, must be reduced from the $28,-083.63 figure reached in that opinion because expert-witness expenses are limited to $30 per day. *See Crawford Fitting Co. v. J.T. Gibbons, Inc.*, —— U.S. ——, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987) (construing 28 U.S.C. §§ 1821, 1920). Plaintiffs may submit revised proof of their costs and expenses taking into account the $30–per-day limitation. In view of the fact that these proceedings have continued beyond the time for which attorneys' fees were awarded in that opinion, plaintiffs' counsel are entitled to submit proof as to fees which should be awarded for work done since February 28, 1986.

## CONCLUSION

Defendants are in violation of Title VIII and 42 U.S.C. §§ 1981, 1982. Judgment is entered as set out in the settlement agreed upon by the parties and approved by the court on October 15, 1986. Plaintiffs are awarded attorneys' fees of $227,418.70 as set out in the court's opinion of February 28, 1986. Plaintiffs will also be awarded costs and expenses, and attorneys' fees incurred after February 28, 1986, as warranted by revised and additional proof which they are to submit.

IT IS SO ORDERED.

## APPENDIX A

### TABLE 1

Racial Composition · of Residents of the
Four Cooperatives as of April, 1978.

| | Efficiency | 1 Bedroom | 2 Bedroom | 3 Bedroom | Total |
|---|---|---|---|---|---|
| White | 314 | 1968 | 1667 | 338 | 4287 |
| | 98.7% | 97.1% | 95.7% | 98.5% | 96.8% |
| Black | 3 | 33 | 30 | 4 | 70 |
| | 0.9% | 1.6% | 1.7% | 1.2% | 1.6% |
| Hispanic | 1 | 10 | 23 | 1 | 35 |
| | 0.3% | 0.5% | 1.3% | 0.3% | 0.8% |
| Asian | 0 | 5 | 16 | 0 | 21 |
| | 0.0% | 0.2% | 0.9% | 0.0% | 0.5% |
| Mixed | 0 | 11 | 6 | 0 | 17 |
| | 0.0% | 0.5% | 0.3% | 0.0% | 0.4% |
| Unknown | 0 | 1 | 1 | 0 | 2 |
| | * | * | * | * | * |
| Total | 318 | 2028 | 1743 | 343 | 4432 |

* Unknowns not included in percentage calculations of racial composition.
Joint Pre-trial Order at 10.

TABLE 2

Racial Composition of Active Applicants
as of September, 1978.

| | Efficiency & 1 Bedroom | 2 Bedroom | 3 Bedroom | Total |
|---|---|---|---|---|
| White | 1182 | 351 | 36 | 1569 |
| | 86.4% | 59.8% | 31.0% | 75.8% |
| Black | 74 | 77 | 25 | 176 |
| | 5.4% | 13.1% | 21.6% | 8.5% |
| Hispanic | 73 | 105 | 33 | 211 |
| | 5.3% | 17.9% | 28.4% | 10.2% |
| Asian | 34 | 51 | 22 | 107 |
| | 2.5% | 8.7% | 19.0% | 5.2% |
| Mixed | 5 | 3 | 0 | 8 |
| | 0.4% | 0.5% | 0.0% | 0.4% |
| Unknown | 21 | 15 | 6 | 42 |
| | * | * | * | * |
| Total | 1389 | 602 | 122 | 2113 |

* Unknowns not included in percentage calculations of racial composition.
Joint Pre-trial Order at 11.

TABLE 3

Racial Composition of Inactive Applicants as of September, 1978.

| | Efficiency & 1 Bedroom | | 2 Bedroom | | 3 Bedroom | | Total | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Plaintiffs' Calculation | Defendants' Calculation | Plaintiffs' Calculation | Defendants' Calculation | Plaintiffs' Calculation | Defendants' Calculation | Plaintiffs' Calculation | Defendants' Calculation |
| White | 3292 93.3% | 3684 94.8% | 1148 80.6% | 1328 83.4% | 157 68.2% | 156 71.2% | 4597 88.7% | 5168 90.7% |
| Black | 103 2.9% | 88 2.3% | 93 6.5% | 95 6.0% | 23 10.0% | 19 8.7% | 219 4.2% | 202 3.5% |
| Hispanic | 85 2.4% | 71 1.8% | 130 9.1% | 106 6.7% | 28 12.2% | 17 7.8% | 243 4.7% | 194 3.5% |
| Asian | 34 1.0% | 36 0.9% | 49 3.4% | 54 3.4% | 22 9.6% | 26 11.9% | 105 2.0% | 116 2.0% |
| Mixed | 13 0.4% | 6 0.2% | 4 0.3% | 10 0.6% | 0 0.0% | 1 0.5% | 17 0.3% | 17 0.3% |
| Unknown | 128 * | 106 * | 55 * | 64 * | 9 * | 14 * | 187 * | 184 * |
| Total | 3650 | 3991 | 1479 | 1657 | 239 | 233 | 5368 | 5881 |

* Unknowns not included in percentage calculations of racial composition.
Joint Pre-trial Order at 12.

TABLE 4

Racial Composition of 1,985 Applicants
Who Moved Into the Cooperatives During
the Period January 1, 1960 Through
December 31, 1978.

|  | Efficiency | 1 Bedroom | 2 Bedroom | 3 Bedroom | Total |
|---|---|---|---|---|---|
| White | 241 | 1301 | 332 | 8 | 1882 |
|  | 99.2% | 95.8% | 88.1% | 100% | 94.8% |
| Black | 1 | 20 | 14 | 0 | 35 |
|  | 0.4% | 1.5% | 3.7% | 0.0% | 1.8% |
| Hispanic | 0 | 17 | 17 | 0 | 34 |
|  | 0.0% | 1.3% | 4.5% | 0.0% | 1.7% |
| Asian | 1 | 7 | 6 | 0 | 14 |
|  | 0.4% | 0.5% | 1.6% | 0.0% | 0.7% |
| Mixed | 0 | 12 | 8 | 0 | 20 |
|  | 0.0% | 0.9% | 2.1% | 0.0% | 1.0% |
| Total | 243 | 1357 | 377 | 8 | 1985 |

Joint Pre-trial Order at 13.