John S. **SHIPLEY** and Rochelle D. **Shipley,** his wife, Plaintiffs,

v.

**FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF DELAWARE, et al., Defendants.**

**Civ. A. No. 84–521 JRR.**

United States District Court, D. Delaware.

Dec. 30, 1988.

---

Raymond M. Radulski, Wilmington, Del., Robert T. Vance, Jr., Brown & Vance, Philadelphia, Pa., for plaintiffs.

Frank J. Miller, Wilmington, Del., for defendant First Fed. Sav. & Loan Ass'n of Delaware.

John A. Elzufon and Lawrence S. Drexler, Elzufon & Associates, P.A., Wilmington, Del., for defendant Joseph B. Green.

## OPINION

ROTH, District Judge:

With this opinion, we attempt to terminate the tempestuous history of this case which has its genesis in the efforts of the defendants, First Federal Savings and Loan Association ("First Federal" or the "Bank") and its attorney, Joseph B. Green, to foreclose on a mortgage held on property owned by the plaintiffs, John S. and Rochelle D. Shipley. The plaintiffs have charged that the defendants violated their civil rights; they seek damages and injunctive relief. Previously, in *Shipley v. First Federal Savings and Loan Association of Delaware*, 619 F.Supp. 421 (D.Del.1985) ("*Shipley I*"), this Court granted motions for summary judgment made by two of the original defendants, Michael Walsh, the Sheriff of New Castle County, and Margo Ewing Bane, the Prothonotary of New Castle County. *Id.* at 440–41. Presently before the Court are motions for summary judgment by the two remaining defendants: First Federal and Joseph B. Green, Esquire.

## I

## FACTS

The parties have incorporated by reference Judge Wright's description of the background facts in *Shipley I*, 619 F.Supp. at 425–27. To ensure that the arguments made by the defendants in this motion are viewed in the appropriate light, however, the Court will recount, as briefly as possible, the factual record without citation.

On July 19, 1978, the plaintiffs took out a mortgage with First Federal named as the mortgagee in order to purchase their home at 609 Wildel Avenue, Minquadel, New Castle, Delaware. First Federal first attempted to foreclose on the plaintiff's property on January 21, 1981, when its attorney, Green, commenced an action in Superior Court. Shortly thereafter, the Bank instructed Green to discontinue the foreclosure proceedings. On August 12, 1982, Green instructed the Prothonotary of New Castle County to dismiss the action.

Green filed a second action for foreclosure, at the request of First Federal, on February 23, 1983. Within a short time, the Bank instructed Green to abandon the proceedings, and Green so notified the Prothonotary.

On May 4, 1983, Green commenced the third foreclosure action against the Shipleys' property in Superior Court on a complaint of scire facias. First Federal attempted to accomplish service by having the Sheriff serve a scire facias sur mortgage writ, summons, and complaint on the Shipleys. The Sheriff's attempts to serve the plaintiffs personally on May 9, 10, 11, 18, and 20, 1983, were unsuccessful. The scire facias writ was returned to the Prothonotary on May 26, 1983, stating, "Non-sunt Inventi to John S. Shipley and Rochelle D. Shipley, his wife, on the 26th day of May, A.D., 1983."

An alias scire facias sur mortgage writ was delivered to the Sheriff's office on June 6, 1983. The Sheriff's attempts to serve the Shipleys personally with the writ,

summons, and complaint on June 8, 13, 14, 16, and 17, 1983, were once again unsuccessful. On June 28, 1983, the writ was returned to the Prothonotary stating, "Non-sunt Inventi to John S. Shipley and Rochelle D. Shipley, his wife, on the 26th day of June, A.D., 1983."

On July 3, 1983, First Federal requested by praecipe the issuance of an execution writ levari facias for the Sheriff to sell the plaintiffs' property. The Sheriff received the writ on July 8, 1983. The basis for issuing this writ was that the Shipleys had been constructively served pursuant to Delaware Superior Court Civil Rule 4(f)(4). This rule provided that "in actions begun by scire facias, 2 returns of service of 2 consecutive writs shall constitute legal and sufficient service." [1] The Prothonotary entered a default judgment in the scire facias proceeding, pursuant to Delaware Superior Court Rule 55(b)(1), based on this constructive service. Although the house was advertised for sale on September 13, 1983, the sale was stayed and the house was not sold. This writ of levari facias was returned to the Prothonotary on September 19, 1983.

Next, the Prothonotary issued an alias writ of levari facias on September 21, 1983, directing the sale of the plaintiffs' property. As before, the sale was advertised, stayed, and the writ was returned to the Prothonotary on November 16, 1983.

On January 18, 1984, a first pluries levari facias writ was issued, and the familiar events ensued: The sale was first advertised, then stayed, and finally the writ was returned to the Prothonotary on March 1, 1984.

In the meantime, on January 24, 1984, the plaintiffs petitioned the Delaware Superior Court to set aside the default judgment that was entered against them in July, 1983. They also sought to stay any further threatened sale of their property. On March 17, 1984, after Judge Bifferato had recused himself from the case, Judge Martin vacated and voided the default judg-

---

1. Judge Wright held in *Shipley I* that this rule failed to provide the required notice to mortgagors such that they were denied due process under Delaware law. 619 F.Supp. at 436–38 & n. 26.

ment against the Shipleys. The Shipleys appealed this decision in their favor to the Delaware Supreme Court. The appeal was subsequently dismissed.

On April 17, 1984, First Federal again sought to obtain a default judgment against the plaintiffs. The Shipleys did not respond by the motion's return date, and the Bank's motion was granted on May 4, 1984. On June 22, the plaintiffs moved in Superior Court to vacate the default judgment. First Federal agreed to vacate the judgment on June 26, 1984, and gave the plaintiffs twenty days to respond to the new complaint. The Shipleys responded to the complaint in a timely manner. Apparently proceedings in the state courts are presently inactive.

On September 21, 1984, the plaintiffs, represented by an attorney, filed their present action in this Court. On November 2, 1984, the Shipleys discharged their attorney and proceeded *pro se* until June 12, 1986, when the plaintiffs' present attorney appeared on their behalf and obtained permission to conduct additional discovery in order to prepare the plaintiffs' response to the present motions.

## II

### ISSUES PRESENTED

The issues that are relevant to the Court's determination of these motions for summary judgment are as follows: the plaintiffs have charged that the defendants acted under color of state law and violated their due process rights established by the fourteenth amendment and enforced by 42 U.S.C. section 1983, by using the state court rule providing for constructive service of process in mortgage foreclosure actions: Rule 4(f)(4).[2] Assuming that we will find that the defendants' actions were taken under color of state law, the plaintiffs urge us not to grant either defendant

a qualified immunity from damages based on a good faith reliance on the constructive service rule's validity. The plaintiffs have also advanced claims against the defendants under 42 U.S.C. sections 1982, 1985(3), and 1986 based on rights guaranteed by the thirteenth and fourteenth amendments.

Although the defendants have moved separately for summary judgment, each raises similar arguments to persuade the Court to grant their motions. First Federal and Green both argue that summary judgment is appropriate because: (1) they did not act under color of state law and therefore could not violate the Shipleys' due process rights as established by the fourteenth amendment and enforced by section 1983; (2) even if they did act under color of state law, they are entitled to a qualified immunity because of their good faith reliance on the validity of the state constructive service rules; (3) there is no proof of either racial discrimination or a racially discriminatory motive for the alleged violations under the various sections of the civil rights statute in title 42 of the United States Code; and (4) there is no proper allegation or proof of the conspiracy as charged by the plaintiffs.

A. *The Standard for Summary Judgment.* Rule 56 provides that a party is entitled to summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c). In accordance with this rule, it is not within the province of the district court to decide issues of fact. The court is limited to determining "whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

---

**2.** It also appears that the plaintiffs assert that the defendants violated their civil rights because they failed to wait the required 20 days from the return of the last writ before requesting that a default judgment be entered pursuant to Rule 55(b)(1). However, the Court finds that "private misuse of a state statute does not describe

conduct that can be attributed to the state," *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 941, 102 S.Ct. 2744, 2756, 73 L.Ed.2d 482 (1982), and therefore, we will not address the plaintiffs' arguments as they apply to the statute's misapplication in this case.

The burden of proving that no genuine issues of material fact exist rests on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985). Likewise, to fend off a motion for summary judgment, the nonmoving party must produce specific evidence showing that there is a genuine issue for trial. *See Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *Jersey Central Power & Light Co. v. Township of Lacey,* 772 F.2d 1103, 1109–10 (3d Cir.1985). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Furthermore, reliance on nothing more than mere assertions in the pleadings is not permissible. *Id.* There must be enough evidence to enable a reasonable jury to find for the nonmoving party on the issue for which summary judgment is sought. *Id.* at 249, 106 S.Ct. at 2510.

Summary judgment may be granted if there is "evidence that is merely colorable ... or [that] is not significantly probative." *Id.* at 249–50, 106 S.Ct. at 2511 (citations omitted). If the nonmoving party fails to make a sufficient showing of an essential element of the case for which that party has the burden of proof, the moving party is entitled to summary judgment as a matter of law. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. In deciding whether to grant summary judgment, a court must draw all inferences from the evidentiary sources in the record in a light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 900 (3d Cir.), *cert. dismissed,* — U.S. —, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

We address the defendants' arguments in turn with this standard for summary judgment in mind.

B. *Section 1983 Claim.* To succeed on a claim based on section 1983, the plaintiffs must demonstrate two elements. First, they must show that they have been deprived of a right secured by the constitution or laws of the United States. Second, they must show that the person depriving them of this right acted under color of state law. *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 946, 102 S.Ct. 2744, 2758, 73 L.Ed.2d 482 (1982). In order for us to find liability, the conduct allegedly causing the deprivation of the federal right must be fairly attributable to the state. This means that

the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... [In addition,] the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

*Lugar,* 457 U.S. at 937, 102 S.Ct. at 2753. Here, since the plaintiffs allege racial discrimination, they must demonstrate facts indicating that the defendants acted under color of state law in depriving them of their civil rights. *Cf. Drum v. Nasuti,* 648 F.Supp. 888, 896 (E.D.Pa.1986), *aff'd mem.,* 831 F.2d 286 (3d Cir.1987).

1. *Acting Under Color of State Law.* Both defendants claim that they were not acting under color of state law, that their actions did not constitute state action,[3] and therefore, they could not violate the Shipleys' constitutional rights provided by the fourteenth amendment and protected by section 1983. The plaintiffs, on the other hand, urge the Court to find that the defendants' actions were state action under the "joint action" or "action in concert" theory.

Because the law in this area is unsettled, determination of whether Green acted under color of state law is one with which

---

3. If certain conduct is state action as delimited by the Supreme Court's decisions, then that action is also action under state law for purposes of § 1983. *Lugar,* 457 U.S. at 929, 102 S.Ct. at 2749. Thus, in this opinion, we use "state action" and "under color of state law" interchangeably.

reasonable minds may disagree. Universal agreement may be achieved, however, for the proposition that there is no clear-cut test for determining what action constitutes state action for purposes of the fourteenth amendment. "Only by sifting facts and weighing circumstances" can the legal significance of state involvement in private conduct be determined. *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). We conclude after careful analysis of all relevant facts and review of the most recent case law, that neither Green nor First Federal's actions, on balance, can be or should be characterized as state action.

■ First we will consider Green's arguments that he was not a state actor. Green urges us to conclude that he was not a state actor based on the proposition that "a private attorney, *while participating in the trial* of a private state court action, is not acting under color of state law." *Raitport v. Provident National Bank*, 451 F.Supp. 522, 531 (E.D.Pa.1978) (emphasis added) (quoting *Hansen v. Ahlgrimm*, 520 F.2d 768, 770 (7th Cir.1975) (citations omitted)). While this may be true,[4] it does not answer the question in this case, namely, whether Green assumed the role of a state actor by using the procedures in the Prothonotary and the Sheriff's offices. Green utilized these procedures while acting outside of his courtroom role as a trial attorney. Thus, the specific holdings in *Raitport* and similar cases do not compel, but merely support, the conclusion that an attorney is not a state actor with respect to action taken on behalf of his or her clients.

Other cases, however, have addressed whether an attorney acquires the label of a state actor based on non-courtroom activities. For example, in *Arment v. Commonwealth Bank*, 505 F.Supp. 911 (E.D.Pa. 1981), the plaintiff alleged that a bank and its attorney conspired to institute criminal proceedings against him to persuade him to pay a delinquent debt. *Id.* at 913. The district court stated that for an attorney to acquire the label of a state actor under a joint action theory, when acting outside of his or her role as a courtroom advocate, the plaintiff must show that the "attorney 'joined or cooperated with' or 'conspired' with state officers who acted under color of state law." *Id.* at 914 n. 6 (citations omitted). The court concluded that the private defendants in this case were state actors only after it had found that there was an unlawful agreement between the defendants and state officers to harass the plaintiff by instigating the criminal proceedings. *Id.* at 914–15.

Similarly in *Drum v. Nasuti*, 648 F.Supp. 888 (E.D.Pa.1986), *aff'd mem.*, 831 F.2d 286 (3d Cir.1987), the district court examined a situation where the plaintiff alleged that three private attorneys and federal prosecuting attorneys had conspired to prevent him from pleading his choice of plea in a criminal action. *Id.* at 891. In determining whether the private attorneys were state actors for purposes of section 1983, the court explained that

> [t]he requirement of action under color of law is satisfied ... when a private person willfully participates in joint action with a state official.... Thus, [to survive the defendant's motion for summary judgment,] plaintiff must demonstrate a genuine issue of material fact that there existed between the private defendant and the state official an understanding, agreement, or conspiracy to deprive the plaintiff of a federal right. He must show a genuine factual issue of a combination, agreement, or understanding among the defendants.... These [sic] must also be a genuine factual issue that the defendants plotted, planned, or conspired together to carry out the chain of events.

648 F.Supp. at 897 (citations omitted). In *Drum*, because there was no evidence of a conspiracy or agreement, the court concluded that the private attorneys did not act under color of state law for purposes of section 1983. *Id.* at 902.

The decision in *Hauptmann v. Wilentz*, 570 F.Supp. 351 (D.N.J.1983), *aff'd mem.*

---

4. Although it is not necessary to adopt this position because this issue is not presently before the Court, we note that this proposition is consistent with our holding.

770 F.2d 1070 (3d Cir.1985), reiterates this conclusion that an attorney is not a state actor unless he or she conspired with state officials to deprive a person of his federal constitutional rights. In *Hauptmann*, the plaintiff alleged that private attorneys, private citizens, and state officials conspired to violate her deceased husband's civil rights. The court found that there was insufficient specificity in the pleading of the conspiracy charges, stating that, to label private citizens state actors, it is insufficient to claim that the private and state actors might have had a common goal; there must have been an agreement to pursue an unconstitutional goal. 570 F.Supp. at 381–82. In *Hauptmann*, the court dismissed the plaintiff's claims because there was no evidence that there was an agreement and because "it is well established that an attorney representing a client does not act under color of state law by virtue of being an officer of the court." *Id.* at 382.

Lastly, in *Chicarelli v. Plymouth Garden Apartments*, 551 F.Supp. 532 (E.D.Pa. 1982), tenants charged that their landlord violated their civil rights by initiating an eviction proceeding. The court, as part of its holding, refused to label an attorney a state actor stating, "It is well-settled that the actions of a private attorney in representing a private client, *including the use of process*, do not constitute state action." *Id.* at 538 (emphasis added) (citing *Henderson v. Fisher*, 631 F.2d 1115, 1119 (3d Cir.1980) (per curiam) (state licensing and regulation of attorneys is insufficient to label them state actors)).

The decisions in *Drum, Hauptmann,* and *Chicarelli*, which built on *Arment*'s reasoning, are the most recent voices in our circuit on the joint action theory of finding private attorneys liable under section 1983. Under their analyses, Green's actions cannot be labeled as state action unless there is evidence of a conspiracy or agreement between Green and state officials to violate the Shipleys' federal constitutional rights. Thus, we now turn to the plaintiff's allegation that there was a conspiracy between Green, First Federal, and state officials to deprive them of their federal constitutional rights.

The plaintiffs have failed to provide proof that such a conspiracy or agreement existed. They allege that "First Federal and Green engaged in a conspiracy, between themselves and others, to violate the Shipleys' civil rights because of their race." Plaintiffs' Answering Brief at 21 (D.I. 226). It appears that they claim that this alleged conspiracy violated both 42 U.S.C. section 1985(3) and section 1983.

To succeed on a section 1985(3) conspiracy claim, the Supreme Court has stated that four criteria must be met. The plaintiff must demonstrate that (1) there was a conspiracy, (2) the conspiracy's purpose was to deprive a person or class of persons of the equal protection, or privileges and immunities, of the law, (3) there was an act in furtherance of the conspiracy, and (4) the person was either injured in his person or property or was deprived of a right or privilege of citizenship. *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971). We need not proceed past the first inquiry, however, because after months of discovery during which the plaintiff's counsel had access to all mortgage files in First Federal's possession (and, as requested, other documents and records) and during which the plaintiffs have deposed all of the Bank's employees, past and present, whom they sought to depose, First Federal's Reply Brief at 2 (D.I. 230), they have still failed to identify facts which could lead us to conclude that there was, or even that there might have been, a conspiracy.

Assertions of a conspiracy, unsubstantiated by facts, are insufficient to overcome the defendants' motions for summary judgment. As the court in *Drum* stated:

> Agreement to commit an unlawful act lies at the heart of a civil conspiracy. Plaintiff cannot expect to rely upon bare assertions, conclusory allegations, or suspicions, regarding the conspiracy, to resist the defendant's summary judgment motion.... Broad or conclusory allegations of a conspiracy are insufficient.

648 F.Supp. at 897 (citations omitted). *Accord Hauptmann*, 570 F.Supp. at 381–82. The plaintiffs have alleged that there was a conspiracy among the defendants, the Sheriff and the Prothonotary to deprive the Shipleys of their civil rights. They have provided no proof of such a conspiracy. The plaintiffs have alleged that there was an understanding among the defendants, the Sheriff and the Prothonotary to ignore the 20 day waiting requirement in Rule 55(b)(1). They have provided no evidence of such an agreement. Because we find that there is no evidence of a conspiracy, the defendants' motions for summary judgment on both the section 1983 conspiracy claim and the section 1985(3) conspiracy claim will be granted.[5]

Having concluded that there was no conspiracy between Green, First Federal, and state officials and that therefore they were not state actors for purposes of the fourteenth amendment, we will reinforce this determination by examining the policy reasons against labeling these private defendants state actors. In essence, the labeling of attorneys, who use state-established procedures, as state actors would be contradictory to the well-settled law that attorneys are not state actors by virtue of being an officer of the court or merely because of state licensing and regulation of the legal profession. *Polk County v. Dodson*, 454 U.S. 312, 324, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981); *Black v. Bayer*, 672 F.2d 309, 317–18 (3d Cir.), *cert. denied* 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982); *Henderson*, 631 F.2d at 1119. *Cf. Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (detailed government regulation of a business does not convert that business's private action into state action).

If we were to conclude that Green was a state actor for having used the state's foreclosure procedure, we would have to label actions taken by attorneys when using any state-established procedure as state action because a line cannot be drawn on a principled basis to distinguish the different actions taken by attorneys as part of their role as legal representatives for their clients.[6] *See Lugar*, 457 U.S. at 951 n. 8, 102 S.Ct. at 2761 n. 8 (Powell, J., dissenting). For example, if we were to label an attorney a state actor because he files papers with the Prothonotary and the Sheriff in seeking to foreclose on mortgaged property, we would also have to label him a state actor for filing articles of incorporation for a corporation, for filing state court papers to initiate a lawsuit, to enforce a judgment, or to notice an appeal, and for various other activities that attorneys normally perform on behalf of their clients. In each situation, the attorney uses state-created procedures to create or enforce legal rights of his or her client. As the Supreme Court stated in *Lugar*, in a society without limits on characterizing private action as state action, "private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them." *Lugar*, 457 U.S. at 937, 102 S.Ct. at 2754. Likewise, in a society that characterizes attorneys' actions as state action, attorneys could face "constitutional litigation" whenever they seek to use some state rule to protect or

---

5. Because a 42 U.S.C. § 1986 claim cannot be maintained unless there is a successful § 1985(3) claim, *Robison v. Canterbury Village, Inc.*, 848 F.2d 424, 431 n. 10 (3d Cir.1988) (citing *Rogin v. Bensalem Township*, 616 F.2d 680, 696 (3d Cir.1980), *cert. denied* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981)), our disposition of the § 1985(3) claim means that the defendants' motions for summary judgment on the § 1986 will also be granted. *Id.*

6. Although there is some authority for the proposition that the differential characterization of attorney's activities can be justified because holding that an attorney's courtroom activities are not state action protects the integrity of the judicial process and recognizes their independence of their actions from the state, *Watertown Equipment Co. v. Norwest Bank Watertown, N.A.*, 830 F.2d 1487, 1496 (8th Cir.1987), *cert. denied* — U.S. ——, 108 S.Ct. 1723, 100 L.Ed.2d 188 (1988), we reject that this reasoning applies only to courtroom activities. In the absence of a factually substantiated claim of a conspiracy between state officials and a private attorney, holding that the actions of a private attorney, taken in furtherance of his representation of his or her client, are not state action helps to protect the integrity of the entire legal process, of which the judicial process is but one cog.

enforce the rights and interests of their clients. Outside of the attachment of property by state officials pursuant to the *ex parte* application of one party to a private dispute, *Lugar* does not go that far. *Id.* at 941–42, 102 S.Ct. at 2756. Thus, we conclude that Green's use of the state foreclosure procedure was not state action, else we label all actions taken by attorneys involving state-created procedures as state action, thereby constantly exposing lawyers to constitutional litigation for actions taken on behalf of their clients.

The plaintiffs, however, argue that the holdings in *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), *Cruz v. Donnelly,* 727 F.2d 79 (3d Cir.1984) (per curiam), and *Robb v. City of Philadelphia,* 733 F.2d 286 (3d Cir.1984) compel the finding that Green was a state actor. Although these cases could be interpreted to conclude that private attorneys are state actors whenever state officials assist them in using state-established procedures, we decline to do so.[7] In our opinion, as we have already stated, it is not only unwise to advance such a policy, but the most recent case law indicates that such an interpretation, if ever viewed in a favorable light, is currently falling out of favor. We will discuss each of these cases briefly to indicate our disagreement with the statements in these opinions that, if adopted by this Court, would label Green a state actor.

In *Lugar,* a creditor sought prejudgment attachment of a debtor's property and filed an *ex parte* petition which resulted in the property being attached. The Supreme Court found that the private actor's actions were state action, but specifically limited its holding to the particular facts of the case: to "the particular context of prejudgment attachment" based on the *ex parte* application of one party. *Lugar,* 457 U.S. at 939 n. 21, 102 S.Ct. at 2755 n. 21. Further, and more importantly, the Court stated explicitly that "we do not hold today that 'a private party's mere invocation of state legal procedures constitutes "joint participation" or "conspiracy" with state officials.'" *Id.* (quoting Powell, J., dissenting, 457 U.S. at 951, 102 S.Ct. at 2761). Thus, because the case *sub judice* does not involve a prejudgment attachment on the *ex parte* application of one party to a private dispute, *Lugar*'s analysis does not strictly apply, and we will not apply it by analogy.[8]

*Cruz* involved a plaintiff who had been strip-searched by two police officers at the request of a supermarket manager who suspected that the plaintiff was a shoplifter. In determining what constituted state action, the Third Circuit stated that the critical question to answer is "whether the state, through its agents or laws, has established a formal procedure or working relationship that drapes private actors with the power of the state." 727 F.2d at 82. In *Cruz,* the court answered this question in the negative and held that the defendants were not liable under section 1983 because there was no indication that an agreement existed under which the policemen's judgment was subordinated to that of the supermarket chain or of the store manager.

Applying this test to the facts in the instant case, we find that Green did not impose his judgment upon that of a state official. We conclude therefore that Green was not a state actor. Although he did make application both to the Prothonotary and to the Sheriff in connection with the foreclosure proceedings, we find that neither office afforded Green's judgment any special significance. The Prothonotary's office was familiar with both Rule 4(f)(4) and Rule 55(b)(1). The employees there knew that service was perfected under Rule 4(f)(4) only after two attempts at service were made. The state was not induced by Green's application to take any action other than what would occur under

---

7. We conclude that none of these cases are controlling to our analysis because none addressed the issue of actions of a private attorney using state-created foreclosure procedures.

8. We agree with Justice Powell that this limitation lacks a principled basis, 457 U.S. at 951 n. 8, 102 S.Ct. at 2761 n. 8, and note that the holding in *Lugar* has not been extended to other areas such as mortgage foreclosure actions.

the ordinary course of events when such an application was made.

Finally, in *Robb*, the Third Circuit held that certain private individuals could be held liable under section 1983 if it were found that they had worked in concert with city officials and that their judgment has been substituted for the judgment of the city officials. The situation in the instant case is factually distinguishable. First, there is no evidence that Green worked in concert with the Prothonotary or Sheriff to deny the Shipleys their constitutional rights, *supra.* Second, as we have already concluded, this is a situation where Green did not substitute his judgment for that of a state official. Green merely took steps which set into motion procedures which the state had previously determined to be appropriate. Viewed in this light, *Robb* is inapposite.

For all of the foregoing reasons we hold that Green's actions were not attributable to the state. Therefore, we hold that because he was not a state actor, Green cannot be held liable under section 1983 and his motion for summary judgment on the section 1983 claim will be granted.

■ First Federal also claims that it was not a state actor with respect to its involvement with the foreclosure proceedings. We note that First Federal's involvement in the foreclosure action was channeled through Green. Because we have already determined that Green's actions were not performed under color of state law, we conclude that First Federal's actions can not be attributed to the state, either.

Even if we had determined that Green were a state actor, however, First Federal is one step further removed from state action than Green. It had no contact with either the Sheriff or the Prothonotary. The Bank neither exercised its own judg-

ment nor substituted the judgment of the state for its own: First Federal merely employed Green to protect its interest in the mortgaged property. Although it appears that the Bank may have been actively involved in directing the foreclosure proceedings, even if Green were a state actor, this would not render the Bank's action state action. It is well-settled law that one cannot be held responsible under section 1983 on a respondeat superior basis. *Polk County*, 454 U.S. at 325, 102 S.Ct. at 453. Moreover, we find Judge Tjoflat to be persuasive in stating that the attorney, and not the client, is responsible for the avenues of legal redress selected. *Jones v. Preuit & Mauldin*, 851 F.2d 1321, 1331–32 & n. 6 (11th Cir.1988) (Tjoflat, J., concurring). We adopt this reasoning in holding that First Federal was not a state actor for purposes of section 1983 regardless of the characterization of Green's actions.[9] Therefore, First Federal's motion for summary judgment on the section 1983 claim will be granted.

■ 2. *Qualified Immunity.* Even though we have concluded that neither Green nor First Federal was a state actor with respect to the actions they took in the foreclosure proceedings on the Shipleys' property, we will also examine whether either defendant would be entitled to assert a defense of qualified immunity if we were to characterize their actions as performed under color of state law.[10] We conclude that, even if the defendants could be labeled as state actors, they would be entitled to assert and they would succeed on a defense of qualified immunity; thus, they would not be subject to section 1983 liability in this action.

Although section 1983 "creates a species of tort liability that on its face admits of no immunities," *Imbler v. Pachtman*, 424 U.S.

9. Judge Tjoflat correctly noted that resolution of this factual situation was not settled by the Supreme Court's opinion in *Lugar. Preuit,* 851 F.2d at 1331–32 n. 7. *Lugar* applies strictly to a situation where the private person, without advice or guidance of counsel, makes an *ex parte* application under a state-created attachment procedure in the context of a pre-judgment attachment. *Lugar* did not address, and therefore does not apply to, the situation like the one in the instant case where the private party sought and used the advice of counsel to protect his rights.

10. In our analysis of this question, we treat the arguments made by the defendants Green and First Federal together.

409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976), the Supreme Court has embraced the notion that, when Congress passed the Civil Rights Act of 1871, it intended to incorporate the immunities then existing at common law. *See, e.g., Owen v. City of Independence,* 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980); *Procunier v. Navarette,* 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978). At times, the Court has indicated that deciding whether an immunity exists should be a simple task of statutory construction to determine whether the immunity existed at the time that the Civil Rights Act was passed in 1871. *Wood v. Strickland,* 420 U.S. 308, 316, 95 S.Ct. 992, 998, 43 L.Ed.2d 214 (1975). However, the Court has also recognized immunities that did not exist at that time. For example, in *Imbler,* the Court recognized an absolute immunity for prosecutors even though the first case to deal with the subject was decided well after passage of the Civil Rights Act. 424 U.S. at 420–29, 96 S.Ct. at 990–94. In determining whether an immunity defense should be available, the Court has also set out a two part test: what policies does an immunity serve and is the immunity compatible with the purposes of section 1983. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 259, 101 S.Ct. 2748, 2756, 69 L.Ed.2d 616 (1981) (the promise of the statute would be defeated by recognizing any pre-existing immunity without determining both the policies it serves and its compatibility with the purposes of section 1983).

Because the Third Circuit Court of Appeals has not addressed the issue of whether private defendants can assert a defense of qualified immunity in section 1983 suits, we will review the policy reasons in support of making such a defense available and explore if such a defense would be in accord with the aims of section 1983. We start our analysis with *Lugar* in which the Supreme Court, responding to the concerns of Justice Powell that private individuals might be found liable for innocently relying on state laws, stated that "this problem should be dealt with not by changing the character of the cause of action but by establishing an affirmative defense. A similar concern is at least partially responsible for the availability of a good-faith defense, or qualified immunity, to state officials." 457 U.S. at 942 n. 23, 102 S.Ct. at 2756 n. 23. Thus, although the Supreme Court did not decide whether private individuals should be able to assert a qualified immunity defense, it strongly suggested that this should be permissible.

Next we note that this question is one which has divided the circuit courts of appeals that have addressed it. The First, Sixth, and Ninth Circuit Courts of Appeals have held that private actors are not entitled to assert a defense of qualified immunity. *Downs v. Sawtelle,* 574 F.2d 1 (1st Cir.). *cert. denied* 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 255 (1978); *Duncan v. Peck,* 844 F.2d 1261 (6th Cir.1988) [11]; *Howerton v. Gabica,* 708 F.2d 380, 385 n. 10 (9th Cir.1983) (conclusory assertion that "there is no good faith immunity under section 1983 for private parties who act under color of state law to deprive an individual of his or her constitutional rights"). *But see Thorne v. City of El Segundo,* 802 F.2d 1131, 1140 n. 8 (9th Cir.1986) (questioning, but not deciding, whether an independent contractor not working for the state could assert a qualified immunity). The Eleventh, Tenth, Eighth, and Fifth Circuit Courts of Appeals, however, have held that private actors, in certain circumstances, are entitled to assert a defense of qualified immunity after they are characterized as a state actor for purposes of section 1983. *Jones v. Preuit & Mauldin,* 851 F.2d 1321, 1325 (11th Cir.1988) (en banc); *De Vargas v. Mason & Hanger–Silas Mason Co.,* 844 F.2d 714, 722 (10th Cir.1988); *Watertown Equipment Co. v. Norwest Bank Watertown, N.A.,* 830 F.2d 1487, 1490 (8th Cir.1987), *cert. denied* — U.S. ——, 108 S.Ct. 1723, 100 L.Ed.2d 188 (1988) (citing *Buller v. Buechler,* 706 F.2d 844,

---

11. Although the Court of Appeals for the Sixth Circuit held that private parties are not entitled to assert a qualified immunity defense, 844 F.2d at 1266–67, it permitted a private defendant to assert the common law good faith defense to malicious prosecution and wrongful attachment. *Id.*

850–53 (8th Cir.1983)); *Folsom Investment Co. v. Moore,* 681 F.2d 1032, 1037–38 (5th Cir. Unit A 1982).

Strong public policy reasons support permitting private parties to assert a defense of qualified immunity in section 1983 suits. The most important reason for extending a qualified immunity defense to private citizens is that "[w]hen a citizen undertakes in good faith to utilize a proceeding at law provided by his state legislature, he should do so with confidence that he need not fear liability resulting from the legislature's constitutional error of which he was unaware." *Preuit,* 851 F.2d at 1325. *See also Buller,* 706 F.2d at 851; *Folsom,* 681 F.2d at 1038. Further, as the Eleventh Circuit stated in *Preuit,* "What we encourage we ought not seek to punish." 851 F.2d at 1325. In this case, the judges of the Superior Court had duly adopted and promulgated Rule 4(f)(4) and Rule 55(b)(1). Both rules were used as a matter of course for many years in the state. There is every indication that the state supported the use of the rules concerning foreclosure.[12] Given these circumstances, we find that denying a private party a qualified immunity would do nothing more than "visit the effects of unconstitutional action by the legislature on innocent citizens," *Folsom,* 681 F.2d at 1037. We think that is inappropriate.

■ Furthermore, allowing the private section 1983 defendants here a defense of qualified immunity is supported by the fact that in *Shipley I* we permitted the Sheriff and the Prothonotary to assert a qualified immunity defense. We find the court's reasoning in *Buller* persuasive:

> [I]t would be anamolous [sic] to hold that private individuals are state actors within the meaning of section 1983 because they invoked a state garnishment statute and the aid of state officers; but deny those private individuals the qualified immuni-

ty possessed by the state officials with whom they dealt because they technically are not state employees.

706 F.2d at 851 (footnotes omitted).[13] The holding in *Lugar* also supports permitting private parties to assert the same immunity as the state actors with whom they can be equated for purposes of section 1983. As the court in *Preuit* stated:

> [T]here is little reason to deny to private defendants the type of immunity which has been granted to public defendants.... [T]he logic of *Lugar* compels the conclusion that while private individuals may sometimes be liable equally with public defendants under section 1983, they should never be held *more* liable. To deny private individuals such immunity would render private individuals more liable than public actors.

851 F.2d at 1325. Because we think it would be inappropriate to have private individuals more liable than state actors for alleged constitutional violations, we hold that private individuals who, by virtue of their actions, take on the appellation and function of state actor may assert a defense of qualified immunity in section 1983 suits.

Permitting private parties to assert a qualified immunity defense is further supported by the nature of the defense. A person who seeks to employ this defense must show that he or she acted in good faith. To have acted in good faith, the defendant must prove that he or she did not know, or reasonably should not have known, that his or her actions violated clearly established constitutional rights. *Preuit,* 851 F.2d at 1325; *Watertown,* 830 F.2d at 1490 (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 813–14, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982)). *Cf. Ryan v. Burlington County,* 860 F.2d 1199, 1204–05 (3d Cir.1988).

---

**12.** *See infra* p. 1134.

**13.** Like the *Buller* court, we do not suggest that "the private defendants' qualified immunity is derived from the state official whose aid they enlisted," 706 F.2d at 851, instead we reason that the immunity is based on a "functional"

rather than a "derivative" approach, consistent with Supreme Court precedent. *See, e.g., Forrester v. White,* 484 U.S. 219, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988); *Harlow,* 457 U.S. at 810–13, 102 S.Ct. at 2734–35.

The defendants in this case fully meet the requirements of good faith. Until Judge Wright declared that the notice provision in Rule 4(f)(4) was violative of the constitutional guarantees of due process, *Shipley I,* 619 F.Supp. at 438–38 & n. 26, it was accepted in the Delaware courts that the rule was constitutional and that therefore persons who used Rule 4(f)(4) were not acting contrary to the Constitution. For example, at a hearing related to this case on February 17, 1984, in the Delaware Superior Court, Judge Bifferato, addressing the Shipleys, stated: "They tried to serve you several times, and they couldn't do it in May. They then filed an alias writ and tried to serve you several more times at 609 [Wildel] Avenue.... And again it was unsuccessful. *Now under Rule 4(f) subsection (4) that service was proper.*" (D.I. 91 at 122–23) (emphasis added). Superior Court Judge Martin, in a letter to the Shipleys dated March 7, 1984, stated that "service is deemed to have been *legal and sufficient* [under Rule 4(f)(4)] as of June 28, 1983, the date the alias writ was returned non-sunt inventi." (D.I. 97A at All) (emphasis added). Given these circumstances, in the face of recorded judicial support of Rule 4(f)(4), we conclude that, as a practical matter, it would have been illogical for either Green or First Federal to contemplate that the Rule was constitutionally deficient,[14] and that no additional deterrence could be achieved by punishing individuals who could not reasonably have known that their actions were improper. Under these conditions, therefore, we hold that in pursuing foreclosure under Rule 4(f)(4) Green and First Federal acted in good faith that the rule was constitutional.

Finally, we conclude that allowing private individuals to assert a good faith defense promotes the public interest because it allows recovery against individuals who take action that they know, or reasonably should know, violates clearly established statutory or constitutional rights of others, but at the same time permits individuals to use presumptively lawful state statutes without fear of facing constitutional litigation. For this reason, the major goals of section 1983 are not compromised by allowing this defense: section 1983 is still able to deter unlawful conduct and is still able to compensate victims of those who in bad faith use state laws or court rules to violate other's constitutional rights. Therefore, we hold that even if Green and First Federal were found to be state actors, they would still be entitled to assert a defense of qualified immunity from the section 1983 claims. They would in that event still have no section 1983 liability because their motions for summary judgment on the section 1983 claims would be granted on the ground of qualified immunity.

■ C. *Section 1982 Claim.* Section 1982 of Title 42 of the United States Code provides that all citizens of the United States shall have the same rights as white citizens to inherit, purchase, lease, sell, hold, and convey real property. This section bars both private and public discrimination with respect to property rights; there is no requirement of state action. *Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 107 S.Ct. 2019, 2021, 95 L.Ed.2d 594 (1987) (citing *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968)). While there is some authority for the proposition that statistical evidence can be used to establish racial discrimination in a section 1982 case, *Lee v. Minnock,* 417 F.Supp. 436, 439 & n. 1 (W.D.Pa.1976) *aff'd mem.* 556 F.2d 567 (3d Cir.1977), the plaintiffs in this case have failed to produce statistical evidence that could persuade us that either Green or First Federal acted with a discriminatory intent or in a discriminatory manner.

We conclude that the plaintiffs have not shown that either Green or First Federal acted in violation of section 1982 for two reasons: the plaintiffs have failed to prove

---

**14.** As we stated in *Shipley I,* 619 F.Supp. at 436, the decisions in *Brown v. Federal National Mortgage Association,* 359 A.2d 661 (Del.1976) and *Gelof v. First National Bank of Frankford,* 373 A.2d 206 (Del.1977) did not address the issue of adequate notice presented by this case, and they cannot therefore be said to have alerted either Green or First Federal that Rule 4(f)(4) violated mortgagors' due process rights.

that either Green or First Federal acted with an intent to discriminate and, even if they do not need to prove intentional discrimination, the plaintiffs have failed to satisfy the requirements of making out a prima facie case under section 1982.

Turning first to the question of intent to discriminate, we find that the plaintiffs have failed to prove that either of the defendants acted with a discriminatory intent. Although section 1982 does not contain a requirement of proving discriminatory intent before imposing liability, two district courts in this circuit and several other courts have pointed out that such a showing is necessary. For example, in *De-Frank v. Pawlosky*, 480 F.Supp. 115 (W.D. Pa.1979) *aff'd mem.* 633 F.2d 209 (3d Cir. 1980), the court, after stating that section 1982 strikes at racially motivated discrimination and that it furnishes no basis for a cause of action for the benefit of litigants who fail to show this, 480 F.Supp. at 118, held that a nurse who was dismissed from her position without a hearing could not maintain a section 1982 cause of action absent a showing of an intent to discriminate on the basis of race. Another district court in this circuit, in dismissing the plaintiff's section 1982 claim based on his Italian heritage, held that a section 1982 claim that fails to allege an appropriate class-based discrimination must fail. *Petrone v. City of Reading*, 541 F.Supp. 735, 739 (E.D.Pa. 1982). In addition, the Court of Appeals for the Seventh Circuit in *Phillips v. Hunter Trails Community Association*, 685 F.2d 184 (7th Cir.1982), stated in dicta that intentional racial discrimination is a "concededly essential element" of a section 1982 claim. *Id.* at 187. In so stating, the court relied on the Supreme Court's holding in *General Building Contractors Association, Inc. v. Pennsylvania*, 458 U.S. 375, 378–91, 102 S.Ct. 3141, 3143–50, 73 L.Ed.2d 835 (1982), that liability may not be imposed under section 1981, the "companion" provision to section 1982, without proof of intentional discrimination. 685 F.2d at 187. Finally, in *Zemesky v. City of New York*, 821 F.2d 148 (2d Cir.1987), the Court of Appeals for the Second Circuit affirmed the district court's dismissal of a schoolteacher's section 1982 claim against city school officials because there was no allegation that "he was deprived of his rights as a result of any racial, ethnic, or class-based animus on the part of the defendants." *Id.* at 150–51. *See also Huertas v. East River Housing Corp.*, 674 F.Supp. 440, 454–55 (S.D.N.Y.1987) (plaintiff is required to show discriminatory intent in section 1982 actions).

These cases support the requirement that plaintiff show an intent to discriminate on the basis of race before liability will be imposed under section 1982. The plaintiffs have not made this showing. As for Green, we have already concluded that he acted in good faith in using Rule 4(f)(4). In addition, after months of discovery, the plaintiffs have failed to produce any evidence to demonstrate that Green used the rule in a disproportionate manner against black mortgagors or to suggest in any way that he acted with a discriminatory intent.

The plaintiffs first counter that Green's hearsay statement to Mr. Shipley, as recounted by Mr. Shipley, that Green would violate the plaintiffs' civil rights in order to protect the interests of the Bank, proves that Green acted to violate their civil rights in violation of section 1982. This statement was allegedly made long after the foreclosure was commenced, and even if Green did make it to Mr. Shipley, it does not indicate a racially discriminatory intent. All citizens have civil rights; therefore, a statement that a person will violate another's civil rights does not automatically translate into a showing of an intent to discriminate on the basis of race. To so conclude would require a logical leap that we are unwilling to make. The plaintiffs have not produced one shred of evidence that would lead a reasonable mind to the proposition that discrimination based on race was ever intended by Green.

Next the plaintiffs argue that Green was familiar with the neighborhoods of New Castle County, that he knew that the neighborhood where the Shipleys resided was primarily black, and that he thus acted in a discriminatory manner knowing that it was probable that the Shipleys were black. The

facts do not support such an argument. According to the 1980 census report for the block on which the Shipleys resided, there were 21 white and four black residents (all in the Shipley household). Green's Reply Brief at 9 (D.I. 227) and Appendix, Ex. F (D.I. 227A). In the greater area surrounding their home, only four percent of the residents described themselves as minorities. *Id.* Thus, contrary to the plaintiffs' assertion, the only reasonable guess that Green could have made, when receiving the information from the Bank about the Shipleys, was that they were *not* members of a minority group. In further support of this position, Green represents in his affidavit, (D.I. 161A at 2, ¶ 9), that, when he is requested by First Federal to institute foreclosure proceedings, he is given "ethnically 'neutral' information." The plaintiffs appear to accede to this statement. Plaintiffs' Answering Brief at 19 (D.I. 226). In addition, when the foreclosure was begun, Green had not yet met the Shipleys. Therefore, the argument, predicated on the presumption that Green knew that he was foreclosing on a black family, must fail.

Assuming then that the plaintiffs need to show that Green acted with a discriminatory intent, they have failed to meet their burden of showing that a reasonable jury could find in their favor. For this reason they cannot survive Green's motion for summary judgment.

As for First Federal, the plaintiffs allege that First Federal acted with a discriminatory intent by directing Green to foreclose on their property. The plaintiffs allege that "approximately 50% of all First Federal mortgage accounts referred for foreclosure proceedings involve [b]lack mortgagors." Plaintiffs' Answering Brief at 17 (D.I. 226). However, they reached this conclusion after examining only 31 of 68 mortgage accounts against which foreclosure actions had commenced but had since terminated. *Id.* at 17.[15] Although we believe that in order to make such a conclusion the sample must be larger, *see e.g., Watson v. Fort Worth Bank and Trust,* — U.S. ——, 108 S.Ct. 2777, 2790, 101 L.Ed.2d 827 (1988) (flaws in the use of statistical evidence include "small or incomplete data sets and inadequate statistical techniques"), this is not the only weakness in the plaintiffs' use of statistics. The plaintiffs ask us to conclude that the Bank exhibited a pattern of racial discrimination because 50% of all mortgage foreclosures were sought against black mortgagors while only 15.1% of the population was black. Plaintiffs' Answering Brief at 17–18 (D.I. 226). This comparison of percentages is neither informative nor appropriate, however. After months of discovery, *supra,* the plaintiffs have failed to prove that blacks constituted less than 50% of the mortgagors who were in default.

The plaintiffs have also failed to show that First Federal foreclosed on a greater percentage of black mortgagors who were in default than of white mortgagors who were in default.[16] Racial discrimination is not shown by statistics which fail to prove this. The first step in a finding of racial discrimination could have been met if, for

---

**15.** The other 37 accounts did not identify the race of the mortgager. Plaintiffs' Answering Brief at 17 (D.I. 226). Thus, the conclusion that roughly 50% of those foreclosed upon were black is misleading. If the remaining 37 mortgagors were white, then only roughly 22% of those against whom the Bank sought to foreclose were black. If, however, all 37 were black, then roughly 76% of those against whom the Bank sought to foreclose were black. Because the data sample is small and the information is incomplete, no reliable inferences can be made from the statistics the plaintiffs cite.

On the other hand, the Bank has produced evidence showing that of the 68 accounts identified by the defendants, 26 were ultimately foreclosed. Of this number, nine belonged to black mortgagors and 17 belonged to white mortga-

gors. First Federal's Reply Brief at 3 (D.I. 230). Thus, of the actual number of mortgages foreclosed by the Bank, 38% belonged to black mortgagors. Further, the Bank has shown that a larger percentage of high loan-to-value mortgages, where the mortgagor is likely to be seriously delinquent at some point, belonged to blacks (60%) than to whites (40%). *Id.* at 4. Thus, the defendant Bank has produced evidence to refute the plaintiffs' allegations. In this situation, summary judgment is appropriate because the plaintiffs have failed to allege facts that would enable a reasonable jury to return a verdict in their favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11.

**16.** *See supra* note 15.

example, 150 blacks and 850 whites were in default on their mortgages and the plaintiffs had shown that First Federal sought foreclosure against all 150 blacks, but only 150 of the 850 whites who were in default.[17] This type of evidence would tend to show that blacks were treated differently than whites with respect to their property rights and thus that the Bank acted in violation of section 1982. In this case, however, there is an absence of this type of statistical evidence or any other evidence indicating a racially discriminatory intent.

Thus, assuming that the plaintiffs need to show that First Federal acted with a discriminatory intent, they have failed to meet their burden of showing that a reasonable jury could find in their favor. We conclude that the Bank's motion for summary judgment on the section 1982 claim is appropriate.

Assuming, on the other hand, that it is not necessary for the plaintiffs to prove that the defendants acted with a discriminatory intent, they must nevertheless satisfy the traditional requirements for making out a prima facie case under section 1982. Although the traditional test is not strictly applicable because it usually applies to either the sale or rental of real property, we conclude that they have not met the test that would be analogous to their situation.

The traditional test, as announced by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) and restated by the Court of Appeals for the Ninth Circuit in *Phiffer v. Proud Parrot Motor Hotel,*

*Inc.*, 648 F.2d 548, 551 (9th Cir.1980), does not include a requirement of proving discriminatory intent,[18] but instead requires the plaintiff to prove: "(1) that he or she is a member of a racial minority; (2) that he or she applied for and was qualified to rent or purchase certain property; (3) that he or she was rejected; and (4) that the housing or rental opportunity remained available thereafter." *Phiffer*, 648 F.2d at 551 (citations omitted). In this situation, where the plaintiffs allege that their civil rights were violated by the defendants' attempts to foreclose on their property, we conclude that to succeed on a section 1982 claim the Shipleys must prove the following elements: (1) that they are members of a racial minority; (2) that they were similarly situated to other persons who had mortgages with First Federal in terms of their timeliness of mortgage payments including any history of delinquency of these payments; (3) that the defendants sought to foreclose on their property; and (4) that the defendants did not seek to foreclose on the property of white mortgagors who were similarly situated to the Shipleys.

The Shipleys have not met their burden of establishing a prima facie case of discrimination with respect to either Green or First Federal. Although it is undisputed that as blacks they are members of a racial minority and that the defendants attempted on several occasions to foreclose on their property, the plaintiffs have failed to establish the other two requirements needed for a successful section 1982 claim in a foreclosure situation. Despite the probability

**17.** Although we provide this example for the sake of clarity, we do not adopt any particular percentage differential necessary to indicate a policy or pattern of racial discrimination.

**18.** *Phiffer* and other cases holding that an intent to discriminate need not be proven to establish liability under section 1982 can, perhaps, be reconciled with our previous discussion of cases that indicate that such a finding is necessary on two grounds. First, we have not discovered a case decided since the Supreme Court's decision in *General Building Contractors*, 458 U.S. 375, 102 S.Ct. 3141, that states that it is unnecessary to show an intent to discriminate in section 1982 cases. Therefore, it is possible that these cases are simply inconsistent with current Supreme Court jurisprudence. Second, the cases

that have held that an intent to discriminate need not be shown, like *Phiffer*, have dealt with situations where the facts overwhelmingly supported a finding of an intent to discriminate evidenced by a blatant and obvious refusal of a seller or renter or real property to deal with minority applicants. *See e.g., Phiffer*, 648 F.2d at 552. Exactly what evidence would suffice to make out a claim of intentional discrimination under section 1982 is unclear, but blatant and obvious refusal by sellers, renters, or mortgagees of real property to deal with minority applicants ought to satisfy this requirement. *Cf. General Building Contractors*, 458 U.S. at 388, 102 S.Ct. at 3149; *Huertas*, 674 F.Supp. at 455–56; *Davis v. Mansards*, 597 F.Supp. 334 (N.D. Ind.1984).

**1138**

that we are beginning to sound like a broken record, it bears repeating that after months of all-encompassing discovery, during which the plaintiffs' counsel had access to all mortgage files in First Federal's possession (and, as requested, other documents and records) and during which the plaintiffs have deposed all of the Bank's employees, past and present, whom they sought to depose, *supra*, the plaintiffs have still failed to produce evidence that either Green or First Federal attempted to foreclose solely, primarily, or in a disproportionate way against black mortgagors. Just as section 1982 does not force a landlord to forego profits by renting to minority tenants who do not have the economic means to pay the rent, *Boyd v. Lefrak Organization*, 509 F.2d 1110, 1111–13 (2d Cir.), *cert. denied* 423 U.S. 896, 96 S.Ct. 197, 46 L.Ed.2d 129 (1975), *cf.* J. Kushner, *Fair Housing* § 2.08, at 32 (1983) (even under a "racial effects" test, where a racial impact establishes a prima facie violation of Title VIII, ability to pay would constitute a business necessity and thus an adequate defense to claims of discrimination by a landlord), we conclude that section 1982 does not force mortgagees to abandon their contractual rights designed to protect their investments with respect to minority mortgagors who are in default on their mortgages.

For all of the foregoing reasons, we conclude that the plaintiffs cannot survive the defendants' motions for summary judgment on the section 1982 claim.

### III

### CONCLUSION

We will grant the defendants' motions for summary judgment on all of the plaintiffs' claims against them in this action and thereby preclude them from recovering damages from either defendant with respect to the claims raised in their complaint.

An appropriate order will follow.